Louis BERENSON and Sue A. Berenson et al., Plaintiffs-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Defendant-Appellee.

Nos. 454 to 455 and 464 to 467, Dockets 73–1701 and 73–1706 to 73–1710.

United States Court of Appeals, Second Circuit.

Argued July 15, 1974.

Decided Nov. 6, 1974.

---

Michael L. Paup, Atty., Tax Div., Dept. of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., and Leonard J. Henzke, Atty., Tax Div., Dept. of Justice, Washington, D. C.), for defendant-appellee.

Charles S. Lyon, New York City (Monroe J. Winston, New York City), for plaintiffs-appellants.

Before WINTER,* and MULLIGAN, Circuit Judges, and NEWMAN, District Judge.**

WINTER, Circuit Judge:

In Commissioner v. Brown, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965) (*Clay Brown*), the Supreme Court considered the tax consequences under the Internal Revenue Code of 1954 of a sale and leaseback transaction between an ordinary seller and a tax-exempt purchaser. It held that the proceeds of sale were taxable as capital gains. The instant case arises from another such transaction entered into after the decision in *Clay Brown* and before enactment of the Tax Reform Act of 1969.

Upon a finding that the purchase price negotiated between the sellers and the tax-exempt purchaser was double the amount that a nonexempt purchaser would have agreed to pay under comparable conditions of payment, a majority of the Tax Court held *Clay Brown* distinguishable and concluded that the proceeds of sale were taxable to the sellers as ordinary income. Louis Berenson, 59 T.C. 412 (1972). We agree in part and disagree in part. We hold *Clay Brown* inapplicable to the extent, but only to the extent, that the proceeds of sale exceed the fair market value of the securities sold if they had been sold by the sellers to a nonexempt purchaser. Accordingly, they are taxable, in part, as capital gains and, in part, as ordinary income. We reverse in part and affirm in part, and remand for further proceedings.

I.

As of December 31, 1965, Louis Berenson et al. (Taxpayers) owned all of the capital stock of two New York corporations—Kitro Casuals, Inc. and Marilyn Togs, Inc. These companies were engaged, respectively, in the manufacture and sale of women's sportswear. Taxpayers had operated them successfully as closely held family corporations [1] for the four preceding years.

On December 31, 1965, Taxpayers sold all of their stock in these corporations to the Temple Beth Ami (Temple), a nonprofit religious corporation located in Philadelphia, Pennsylvania. Temple was exempt from federal income tax under §§ 501(a) and 501(c)(3) of the Internal Revenue Code, and since it was a "church" within the meaning of § 511(a)(2)(A), as that section read prior to its amendment by the Tax Reform Act of 1969,[2] Temple was also exempt

---

\* Of the United States Court of Appeals for the Fourth Circuit, sitting by designation.

\*\* Of the United States District Court for the District of Connecticut, sitting by designation.

1. A small (12%) outside interest was redeemed on May 21, 1965.

2. The taxes imposed by paragraph (1) shall apply in the case of any organization (other than a church, a convention or association of churches, or a trust described in subsection (b)) which is exempt . . . from taxa-

from the tax imposed by § 511(a)(1) upon the "unrelated business taxable income" of exempt organizations.

Temple agreed to pay $6,000,000 for Taxpayers' stock in quarterly installments, with interest at 4%, in accordance with the schedule set forth in the margin.[3] Temple was not required to make any initial downpayment, and the first quarterly installment was due at the end of the first quarter of 1966.

On the same day that it acquired Taxpayers' stock, Temple formed a partnership under the name Kitro Casuals Co. with one Robert M. Bernstein, who had acted as a finder in relation to the stock purchase. Temple was a limited partner and Bernstein the general partner; the purpose of the partnership was to operate the businesses of the two corporations. During the period from January 3, 1966 through January 1, 1981, Temple's share of the net profits of the partnership was fixed at 95.5%, with the remaining 4.5% going to Bernstein. After January 1, 1981, net profits were to be divided equally. Upon acquiring Taxpayers' stock, Temple caused the two corporations to be liquidated and their assets distributed to Temple which then conveyed them to the partnership.

On January 3, 1966, Kitro Casuals Co. employed Taxpayer David Cohen to manage the business of manufacturing and selling women's sportswear that it had just acquired from Temple. After becoming general manager, David Cohen, acting in behalf of the partnership, employed Taxpayers Louis Berenson, Samuel Cohen, and Isidore Cohen to be assistant general managers. These taxpayers served the partnership in these capacities throughout the tax years in issue. Thus, the continuity of the management of the underlying business was left completely undisturbed by the sale of stock.

Two important modifications to the sales agreement were subsequently agreed to by Taxpayers and Temple. First, it was provided that, in the event that Temple defaulted in its obligation to meet scheduled payments of the purchase price, Taxpayers' "sole remedy shall be the right to have returned to them [Temple's] capital account in the business formerly conducted by the Corporations." None of Temple's other assets were to be subject to its obligation to pay the purchase price. Second, it was agreed that in the event that 80% of Temple's distributive share of the partnership's net profits for a given quarter exceeded the payment due to Taxpayers for that quarter, such excess would be paid to Taxpayers in prepayment of future installments in inverse order of maturity.

tion under this subtitle by reason of section 401(a) or of paragraph (3), (5), (6), or (17), of section 501(c). 26 U.S.C. § 511(a)(2)(A) (1964).

3.

| Year | Annual Amount to be Paid | Quarterly Amount to be Paid | Allocation Between Interest and Principal |
|---|---|---|---|
| 1966 | $ 300,000 | $ 75,000 | Principal |
| 1967 | 300,000 | 75,000 | Principal |
| 1968 | 400,000 | 100,000 | Principal |
| 1969 | 400,000 | 100,000 | Principal |
| 1970 | 400,000 | 100,000 | Principal |
| 1971 | 500,000 | 125,000 | Principal |
| 1972 | 600,000 | 150,000 | Principal |
| 1973 | 700,000 | 175,000 | Principal |
| 1974 | 700,000 | 175,000 | Principal |
| 1975 | 700,000 | 175,000 | Principal |
| 1976 | 1,000,000 | 250,000 | Principal |
| 1977 | 920,000 | 230,000 | Interest |
| 1978 | 920,000 | 230,000 | Interest |
| Total Payments | $7,840,000 | | |

The tax years in issue are 1966 through 1968. During them, Temple made payments to Taxpayers out of its distributive share of the net profits of Kitro Casuals Co. in accordance with the schedule of payments, as subsequently modified, set forth in the sales agreement, except that Taxpayers agreed to the withholding of certain amounts due to be reinvested in the business. Taxpayers reported the amounts that they received from Temple during these years, using the installment method under § 453, as gains from the sale of capital assets held for longer than six months. Upon the theory that the transaction described above did not constitute a "sale" of Taxpayers' stock in Kitro Casuals, Inc. and Marilyn Togs, Inc. within the meaning of § 1222(3) of the Code, the Commissioner ruled that the payments that Taxpayers received during the years in issue were ordinary income and he assessed deficiencies against each of Taxpayers accordingly. The Tax Court, by a split decision, upheld the Commissioner's determination.

## II.

Prior to the enactment of the Tax Reform Act of 1969, including the time of the stock purchase agreement and each of the three subsequent tax years in issue, Temple's distributive share of the net profits of the limited partnership was exempt from both the federal corporate income tax and the tax upon the "unrelated business income" of exempt organizations imposed by § 511(a)(1). Therefore, the entire amount of such distributive share, before taxes, was available to meet the quarterly installments on the purchase price due to Taxpayers.

By the purchase, Temple, made no outlays and risked none of its other property. At the same time it potentially would acquire an unencumbered one-half interest in the assets of the businesses after thirteen years if its share of the pretax earnings turned out to be sufficient to pay off the purchase price. Furthermore, should Temple's distributive share of the partnership income for any quarter exceed the payment due Taxpayers for that quarter, Temple could retain such excess up to 20% of the total distributive share for such quarter. Temple acquired these rights to increase its income and assets at no greater cost than the effort of putting pen to paper.

It is at once obvious that the incentive to Taxpayers to enter into the transaction lay in the tax treatment afforded the amounts to be paid to them, as well as certain benefits accruing to them, directly or indirectly, because of Temple's tax-exempt status. If the transaction constituted a "sale" of Taxpayers' stock within the meaning of § 1222(3), payments received by them, for the tax years in question, would be treated as capital gains. As a result, Taxpayers would be able to transform the future pretax earnings of the businesses that they had owned, up to a ceiling of $7,840,000, spread out over thirteen years in the manner set forth in the schedule of payments, into income taxed at favorable capital gains rates. Temple's tax-exempt status made the transaction economically feasible—both with regard to the payments to be made and perhaps also with regard to the total purchase price.

The Commissioner has waged a long war, both in the courts and Congress, to strip transactions of the nature described of their beneficial tax consequences. In 1965, the Commissioner sought to have the Supreme Court rule that a transaction similar to that in the instant case was not a "sale" of the taxpayer's stock under § 1222(3). That decision was *Clay Brown*.[4] Unsuccessful in the Supreme Court in *Clay Brown*,

4. There were differences between the transaction in *Clay Brown* and that employed here. Unlike Temple, the exempt organization in *Clay Brown* was not also exempt from the "unrelated business income" tax under § 511(a). Therefore, it could not operate the acquired business through the medium of a limited partnership. Reg. § 1.-512(c)–1. Instead, the acquiring exempt organization leased the assets of the business

the Commissioner finally prevailed in Congress by the enactment of the Tax Reform Act of 1969. But since the latter would not apply to the tax years in issue in the instant case, we must analyze *Clay Brown* with care and decide if it is applicable here.

In *Clay Brown*, the Supreme Court held that the transaction under review was a "sale" within the meaning of § 1222(3). The basis of this holding was that, in the absence of a special Code definition of the term "sale," the ordinary meaning of the word should govern, unless the application of such ordinary meaning can be shown to lead to a result contrary to the underlying purposes of the Code provision under consideration. There, the transaction had all the incidents of a sale under applicable local law. The Commissioner's primary contention was that the transaction should not be regarded as a "sale" because the purchasing exempt organization incurred no downside risk in entering the transaction. The Supreme Court refused to establish a requirement that a transfer of a business involve some shifting of the negative risks of its operation from the transferor to the transferee in order to constitute a "sale" of such business for capital gains purposes. It decided that the absence of such risk-shifting did not prevent the exempt organization from acquiring the property interest in the corporate stock and underlying assets under local law which normally results from a sale transaction, and which could ripen into unencumbered title should the future profits of the business be sufficient to satisfy the purchase price; and, most importantly, that the absence of such risk-shifting did not threaten the underlying purposes of the capital gains provisions.

To the contrary, the Court explained that, since the purchase price had been found by the Tax Court to be " 'within a reasonable range in light of the earnings history of the corporation and the adjusted net worth of the corporate assets.' 37 T.C. 461, 486," 380 U.S. at 572, 85 S.Ct. at 1167, it represented appreciation in the property that had accrued during the period prior to the date of its transfer to the exempt organization. It is the purpose of the capital gains provisions to permit a taxpayer to realize such prior accrued appreciation at capital gains rates. 380 U.S. at 572–573, 85 S.Ct. 1162. The Court stressed that the Commissioner failed to attack frontally the Tax Court's findings concerning the value of the business; instead, the Commissioner invited the Court to consider that the purchase price agreed upon between a selling taxpayer and a purchasing exempt organization in a transaction such as that under consideration would, of necessity, be excessive because of the absence of risk-shifting and the availability of the future pretax income of the business to satisfy the purchase price. The Supreme Court said that it could not ignore the Tax Court's express findings on value and that, therefore, a ruling in favor of the Commissioner would necessarily invade the current capital gains policy. 380 U.S. at 579, 85 S.Ct. 1162. The Court suggested that the Commissioner seek a more precise legislative remedy for the disturbing tax avoidance features of transactions, such as that before the court, that resulted from the existing state of statutory law. Id.

for a term of five years to a corporation managed by the selling taxpayers. The exempt organization was entitled to 80% of the operating profits, before taxes and depreciation, as rent, 90% of which was to be applied to the purchase price of the stock. This arrangement guaranteed that the rents would be tax exempt in the hands of the exempt organization, because rents from real property, and personal property leased with

real property, were excluded from "unrelated business taxable income." 26 U.S.C. § 512(b)(3) (1964). Although § 514, as it then read, included rental income from the lease of business assets, to the extent that the exempt organization acquired such assets through debt financing, these provisions did not apply to leases for terms of five years or less. 26 U.S.C. § 514(c)(1) (1964).

To recount the Commissioner's victory in Congress, the Tax Reform Act of 1969 stripped transactions, such as that recognized to be a "sale" in *Clay Brown*, of their tax avoidance potential by ensuring that the income from the business in the hands of the exempt organization was taxable as unrelated business income. Section 511(a)(2)(A) was amended to subject churches and related organizations to the tax imposed by § 511(a)(1) upon "unrelated business taxable income"; [5] § 514 was also revamped to ensure that rental income from all leases of business assets acquired through debt financing would be included within the exempt organizations' "unrelated business taxable income." [6] No effort was made to alter the § 1222(3) capital gains provision at issue both here and in *Clay Brown*. Consequently, congressional disapproval of the Supreme Court's resolution of the "sale" issue in *Clay Brown* cannot be inferred.

### III.

The issue to be resolved is whether the transaction consummated by Taxpayers and Temple in 1965 is sufficiently different from that recognized to be a "sale" in *Clay Brown* to warrant different tax treatment. A majority of the Tax Court found that it was, because of its finding that the purchase price was more than twice what a nonexempt purchaser would have agreed to pay under comparable conditions of payment.

The Tax Court's specific finding was that

> the stated price of $6,000,000 was more than double the price that would be paid for the stock, on substantially the same terms, by a prospective pur-

chaser who was not exempt from the income tax. 59 T.C. at 416.

It emerged from the following: the Commissioner qualified an investment banker as an expert witness, and he testified that, had he been representing a nonexempt purchaser interested in acquiring Kitro Casuals, Inc. and Marilyn Togs, Inc. (including a guarantee of Taxpayers' continued management) through an arrangement whereby the payment of the purchase price was secured by the future earnings of the business, he would have recommended that the purchaser agree to pay the net worth of the business as an original downpayment plus ten times the annual average earnings after taxes of the business for the first three years after the sale. Based on the assumption that such after-tax earnings would be approximately $250,000 per year, [7] and given a net worth of between $400,000 and $500,000, the expert said he would advise a prospective purchaser to pay between $2,500,000 and $3,000,000.

In contrast to the Tax Court's finding here that the negotiated price was more than double the price that would be paid by a nonexempt purchaser, the Tax Court's finding in *Clay Brown*—accepted by the Supreme Court—was that the negotiated price was within a reasonable range given the net worth and earnings history of the company. Specifically, in *Clay Brown*, the appraised net worth of the assets of the business was $1,064,877. [8] The taxpayers sold all of their stock in this business corporation, plus two notes in the aggregate amount of $125,000 issued by the corporation, for $1,300,000. [9] Thus, for a price of $1,300,000 ($125,000 of which was re-

---

5. P.L. 91–172, 91st Cong., 1st Sess., § 121(a), 83 Stat. 536.

6. P.L. 91–172, 91st Cong., 1st Sess., § 121(d), 83 Stat. 543. These amendments were aimed specifically at the situation in *Clay Brown*. They eliminated the exception for leases for a term of five years or less. See note 4, supra.

7. This $250,000 post-tax earnings figure was based upon an estimate that the pre-tax earnings of the two companies would have been $500,000 for the period July 1, 1965 through June 30, 1966. Such estimate was based upon projections from monthly income statements for the 1965 calendar year.

8. Clay B. Brown, 37 T.C. 461, 469 (1961).

9. 37 T.C. at 472.

payable in satisfaction of the notes), the exempt organization received a business owning property that could have been disposed of without regard to continuation of the business for approximately $1,064,877. The $110,123 premium, i. e., the excess of net purchase price over net asset value, that had been agreed to could readily be explained by the favorable earnings history of the business.

We agree with the majority of the Tax Court that, because of the finding that the purchase price in this transaction was substantially in excess of what a nonexempt purchaser would have paid for the business under identical terms, *Clay Brown* does not compel the conclusion that all of the proceeds of sale must be afforded capital gains treatment. The Supreme Court took such pains to explain the significance of the Tax Court's finding in *Clay Brown* that the purchase price was within a reasonable range in view of the adjusted net worth and earnings history of the company, that we cannot escape the conclusion that the Court would have found itself presented with a substantially different problem had there been a finding of an excessive purchase price such as that here and would have reached a different result. However, we also believe that the result reached by the Tax Court, i. e., that none of the proceeds of sale is entitled to capital gains treatment, is, in part, inconsistent with the decision in *Clay Brown,* and that, to the extent of such inconsistency, it must be reversed.

As pointed out earlier, the Supreme Court said that the result contended for by the Commissioner in *Clay Brown* would amount to a significant invasion of the policy underlying the capital gains provisions, i. e., the policy to mitigate the harshness of taxing the entire amount of appreciation in value accruing over an extended period of time in the tax accounting period in which a final disposition of such property is made.

The Tax Court's implied, but inexact, finding concerning the value of the business in the instant case means that there was substantial, although not precisely determined, past accrued appreciation in Taxpayers' stock.[10] As a consequence, the Tax Court's ruling that all gain should be denied capital gains treatment defeated this purpose since it characterized the entire amount of Taxpayers' gain as ordinary income. We, therefore, believe that a "sale," within the meaning of § 1222(3), has indeed occurred here and that the amount realized on such sale must include such amounts of the agreed upon purchase price as represent the appreciation in the value of Taxpayers' businesses that had accrued up to the date of sale. Taxpayers are, we hold, entitled to capital gains treatment on that portion of each of the payments here in issue which bears the same ratio to such payment as the gain, computed by subtracting Taxpayers' basis from the fair value to a nonexempt purchaser under identical terms, bears to the entire purchase price. The balance, to the extent that it exceeds Taxpayers' basis and the portion entitled to capital gains treatment, is taxable as ordinary income.

Taxpayers' contention that the agreed upon purchase price here was not excessive in the sense necessary to distinguish their cases from *Clay Brown* is based upon the assertion that the amount that a nonexempt purchaser would have been willing to pay under identical terms is an improper standard against which to measure the "reasonableness" of the purchase price. Admittedly, the Tax Court did not find that the price was unreasonably high from the point of view of an exempt purchaser. Indeed, since the transaction here was arrived at through good faith bargaining and was not a sham, the conclusion seems inescapable that the agreed upon price was within a reasonable

10. The real amount of such appreciation could, of course, only be determined by subtracting from the Tax Court's estimate of the fair market value of the businesses the taxpayers' original basis in their stock.

range for a tax-exempt purchaser.[11] However, Congress has long regarded the impact upon the market place of an exempt organization's ability to conduct a business free from income taxation as an unwholesome form of discrimination.[12] The same tax exemption which gives an unfair competitive advantage to an exempt organization in the operation of a business also permits it an unfair degree of purchasing power in the acquisition of such a business. We think it would be inappropriate to include an increase in value, attributable solely to the presence of such unfair purchasing power, within the past accrued appreciation that the capital gains provisions seek to shield from taxation at ordinary rates. We therefore reject Taxpayers' contention.

In sum, we conclude that the portion of the purchase price agreed to by Temple and Taxpayers that is in excess of the price a nonexempt purchaser would have paid under identical terms is not part of the proceeds of a § 1222(3) "sale," and is, therefore, taxable as ordinary income to the recipients.

## IV.

Although the Tax Court has found that the purchase price agreed to was substantially in excess of the price that would have been negotiated with a nonexempt purchaser under identical terms, and its finding is properly supported by the evidence of an expert witness, the finding is not precise enough to permit a final disposition of Taxpayers' deficiency assessments without a further evidentiary hearing. It will be necessary for the Tax Court, as a beginning computation, to separate the purchase price into the portion that is attributable to the accumulated value of the corporations at the time of the purchase and the portion attributable solely to the extra purchasing power possessed by Temple by virtue of its tax-exempt status.

Accordingly, the judgment of the Tax Court is reversed in part and affirmed in part, and the cases remanded for further proceedings consistent with this opinion. Costs shall be divided equally between the parties.

Reversed in part; affirmed in part; and remanded.

---

11. The availability of the pretax earnings of the enterprise to satisfy the purchase price underlies the phenomenon that a tax-exempt purchaser will be willing to pay substantially in excess of what a non-exempt purchaser would agree to. The evidence here demonstrates the operation of this factor very well. The agreed upon purchase price was determined by a projection of the pretax earnings of the businesses into the future. 59 T.C. at 416.

12. The Revenue Act of 1950, 81st Cong., 2d Sess., Ch. 994, 64 Stat. 906, for the first time imposed a tax on the unrelated business income of exempt organizations. One of the primary purposes of this provision was to eliminate the unfair competitive advantage that an exempt organization had over nonexempt persons in the operation of a business. H.Rept.No.2319, 81st Cong., 2d Sess. at 36. This same policy was reiterated in the legislative history of the provisions of the Tax Reform Act of 1969, which eliminated the tax exemption which made transactions such as that now under consideration an attractive tax savings device. H.Rept.No. 91-413, 1969 U.S.Code Cong. & Admin.News at 1691.