**Aaron KRAUT et al.,**
**Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**Nos. 359–360, Dockets 75–4124, 75–4125.**

United States Court of Appeals, Second Circuit.

Argued Dec. 1, 1975.

Decided Dec. 31, 1975.

Hermann Rogge, New York City (O. John Rogge, New York City; Sidney N. Solomon, Lake Success, N. Y.), for petitioners-appellants.

Michael L. Paup, Atty., Tax Div., Dept. of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Jeffrey S. Blum, Attys., Tax Div., Dept. of Justice, Washington, D. C.), for respondent-appellee.

Before LUMBARD, FRIENDLY and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

These appeals by taxpayers raise once again the question of the tax consequences under § 1222(3)[1] of the Internal Revenue Code of 1954 of a sale of stock by an ordinary seller to a tax-exempt purchaser, when the sale is financed by the profits of the sold business. See *CIR v. Brown*, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965) (*Clay Brown*). The transactions involved here preceded the Tax Reform Act of 1969[2] and the decision below was rendered before the opinion of this court in *Berenson v. CIR*, 507 F.2d 262 (2 Cir. 1974). The question posed is to what extent, if any, are the proceeds of such sale to be considered ordinary income to the seller.

The taxpayers, Aaron and Iris Kraut, and Harry and Marian Kraut, appeal from decisions of the United States Tax Court which, in an opinion and findings of fact by Hon. Arnold Raum, filed on June 27, 1974 and reported at 62 T.C. 420 (1974), determined that Aaron and Iris Kraut owed a deficiency of $240,-787.08 in income taxes for the year 1967 and that Harry and Marian Kraut owed a deficiency of $246,847.44 in income taxes for the same year.

I

Aaron and Harry Kraut had been for some twenty years in the business of

---

1. "For purposes of this subtitle— . . .

(3) *Long-term capital gain.*—The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income."

2. That act, Pub.L. 91–172, 83 Stat. 536, repealed the preferred status of churches with respect to unrelated business income by deleting the former exception for churches in Int. Rev.Code § 511(a)(2)(A).

manufacturing electric wire. The Krauts' business was operated through a variety of corporations, Trio Wire and Cable Corporation (Trio),, Christmas Wire Manufacturing Corporation (Christmas), and eventually in 1965 Nassau Plastic and Wire Corporation (Nassau). Iris Kraut and Marian Kraut each contributed $100 to Nassau in exchange for 100 shares of stock in the corporation. Their husbands were not stockholders but effectively operated the business. Nassau occupied a leased building, previously occupied by Christmas, on Meserole Avenue in Brooklyn, where it kept its only equipment, an extruder owned by Trio. The extruder was utilized to manufacture Christmas wire which is light gauged and protected by a plastic insulation. Christmas decoration manufacturers purchased the wire and attached to it light bulb sockets which puncture the plastic jacket and make contact with the wires. Nassau had developed a new insulating material which was easily penetrable and was likely to minimize man-ufacturer rejection which had plagued the Christmas-light business in the past.

In 1966, an investment counseling firm brought a proposal to Rev. Rex T. Humbard, pastor of the Cathedral of Tomorrow (Cathedral), a tax-exempt religious corporation in Akron, Ohio, that it purchase Nassau. Before any deal was consummated, however, the Krauts entered into a contract of sale on May 31, 1966 with Wilson Mold & Die Corporation (Wilson) which purported to sell all the stock of Nassau to Wilson. Shortly thereafter, on June 15, 1966 the Krauts entered into a three-cornered deal with Wilson and Cathedral whereby Wilson was relieved of its obligation to buy the Nassau stock and Wilson assigned all of its rights and obligations to Cathedral. The significant terms of the agreement are set forth in the margin.[3] We note that the sales price was dependent upon Nassau's future profits and was to range from a minimum of $500,000 to a maximum of $3,500,000, entirely paid from the sold business's income, for the fol-

3. "The Buyer [Cathedral] shall take all such action as may be required so that on or as of June 25, 1966 Nassau Plastic shall be liquidated and all of its assets distributed to the Buyer. Simultaneously with the execution of this Agreement, the Buyer, with the consent of the stockholders and directors of the Sellers [Iris and Marian Kraut], shall take steps forthwith to accomplish the following:

(a) Create a separate operating-manufacturing unit, owned by the Buyer, to be denominated and known as Nassau Plastic (hereinafter sometimes interchangeably referred to as 'Nassau Plastic & Wire Co.' * * *); the Buyer to file such documents with the proper governmental authorities as may be necessary to effectuate the same.

(b) The name of Nassau Plastic & Wire Corp. shall be changed forthwith, to such name as the Buyer may designate.

* * * * * *

The purchase price for all of the stock sold under this Agreement shall be not less than $500,000 (hereinafter called the 'Minimum Price') nor more than $3½ million (hereinafter called the 'Maximum Price'). The purchase price shall be paid by the Purchaser to the Sellers at the following time in the following manner and to the extent set forth below:

(a) For the period from June 25, 1966 to July 1, 1966, 100% of the net income of the Corporation shall belong to the Sellers; the Purchasers shall receive credit for said amount toward the purchase price.

(b) $50,000 on or before August 1, 1966.

(c) For the balance of the year 1966 and in each of the years 1967 through 1976 terminating however on June 30, 1976 inclusive, unless the Maximum Price be paid in full prior thereto; commencing with the 15th day of October 1966 and on the 15th day of each January, April, July and October thereafter in respect to each preceding quarterly period from July 1, 1966 through June 30, 1976, an amount equal to 75% of the Corporations [sic] net income before Federal income taxes for each of such next preceding fiscal periods. In the event a loss occurs in any quarterly period, said loss shall be utilized as an offset in each of the succeeding quarterly periods (until said loss has been recouped) before payments to the Sellers are resumed.

(d) In any event and notwithstanding any provision in this Agreement with respect to the contingent deferral of installment payments of the Purchase Price, the full Minimum Price referred to above and any portion of the Maximum Price referred to above which Sellers may become entitled to receive shall be paid in full on or before July 15, 1976.

(e) The Purchaser may prepay at any time all or any part of the unpaid amount of the Maximum Price."

lowing ten years. The Krauts, husbands of the Nassau stockholders, were retained as employees of Cathedral at $5,200 each per annum and so remained in effective day-to-day control of the business. Cathedral qualified under § 501(c)(3) of the Internal Revenue Code as a tax-exempt religious organization and so was exempt from paying either normal income tax or taxes on unrelated business income.[4] Cathedral paid off its debt to the Krauts with tax-free income from Nassau.

The agreement further provided that the taxpayers were to retain a security interest in all of the assets of Nassau subordinate to prior liens and the right of present and future creditors. In the event of default by Cathedral, enforcement of the security agreement constituted the taxpayer-sellers' exclusive remedy with no right to secure any deficiency judgment or other judgment for damages against Cathedral.

The business was initially very successful. Cathedral paid Iris and Marian Kraut $147,500 in 1966 (including a required $50,000 down payment) and $1,332,500 in 1967. Thereafter the business became unprofitable and ceased operation in 1969. The taxpayers, after deductions, each reported $606,416.67 as long-term capital gains for 1967. The Commissioner determined that $595,-776.09 of each couple's receipts was taxable as ordinary income. He deducted the value of Nassau's stock from the taxpayers' receipts under the sales contracts, assigning a value of $168,445.60 to the stock, an amount equal to ten times Nassau's taxable income for the year ended June 30, 1966, the year prior to the sale. Taxpayers then filed petitions contesting the determination, taking the position that the property sold was a capital asset so that the gain was taxable only as a long-term capital gain. The Tax Court rejected this contention and this appeal followed.

## II

In *Clay Brown* the Supreme Court held that the somewhat similar transaction there involved constituted a sale within the meaning of § 1222(3) (and thus was taxable as long-term capital gain) even though the exempt organization incurred no downside risk. The absence of a shift in risk did not preclude the "sale" of the stock and underlying assets under applicable law. The Court further noted the Tax Court's finding that the purchase price was "within a reasonable range in light of the earnings history of the corporation and the adjusted net worth of the corporate assets." 380 U.S. at 572, 85 S.Ct. at 1167. In *Clay Brown* the appraised net worth of the assets of the business was $1,064,-877 and the sales price was approximately $1,300,000.

This court faced a related problem in *Berenson*, which involved a bootstrap sale of closely held corporate stock. There a tax-exempt entity agreed to pay $6,000,000 over a twelve-year period for stock, a price which the Tax Court held was more than double the price that would be paid for the same stock by a prospective purchaser who was not exempt from income tax. We held that *Clay Brown* did not wholly govern in view of the disparity in *Berenson* between the prices that exempt and non-exempt purchasers would pay, a disparity that did not exist in *Clay Brown*. Rather than holding that none of the proceeds were entitled to capital gains treatment, since a sale had in fact occurred in *Berenson* within the *Clay Brown* rationale, we determined:

> In sum, we conclude that the portion of the purchase price agreed to by Temple [the tax-exempt entity] and Taxpayers that is in excess of the price a non-exempt purchaser would have paid under identical terms is not part of the proceeds of a § 1222(3)

**4.** However, the Tax Reform Act of 1969 later changed the status of churches as regards un-

related business income. See note 2 *supra* and accompanying text.

"sale," and is, therefore, taxable as ordinary income to the recipients.

507 F.2d at 269.

Both parties to this appeal agree that *Clay Brown* and *Berenson* are applicable. The appellants maintain however that the fair market value of the stock of Nassau should be held to be $3,500,000, which was the maximum price that the non-exempt purchaser Wilson as well as Cathedral agreed to pay. The appellee argues that the allocation made below should be affirmed on the basis of our holding in *Berenson*.

In light of *Berenson* we feel constrained to find that the sale was bona fide under *Clay Brown* and the Commissioner on this appeal does not argue to the contrary. The Tax Court below, which rendered its decision before *Berenson* was decided, concluded that the sale was not bona fide within *Clay Brown* and would have charged the taxpayers with the entire net proceeds undiminished by any so-called "true selling price." However, the Commissioner had previously determined an amount of $168,445.60 to be a bona fide sales price and had limited the taxpayers' ordinary income tax liability to the excess over that true value. Since the Commissioner had not successfully sought to amend the pleadings below to ask for increased deficiencies,[5] the Tax Court felt compelled to make the allocation set by the Commissioner. Thus, although Judge Raum found that no bona fide sale took place, he applied in effect the *Berenson* allocation rule yet to be articulated by this court.

### III

■ The sole issue before us is whether or not the Tax Court's refusal to disturb the Commissioner's determination that the true value of Nassau's stock was $168,445.60 was erroneous. We commence with the proposition that the deficiency asserted by Commissioner is presumptively correct and the burden of disproving it rests upon the taxpayer. Rule 142(a), Rules of Practice and Procedure of the United States Tax Court (see 26 U.S.C.A. § 7453 (1975 Supp.)); *Helvering v. Taylor*, 293 U.S. 507, 515, 55 S.Ct. 287, 291, 79 L.Ed. 623 (1935) ("Unquestionably the burden of proof is on the taxpayer to show that the Commissioner's determination is invalid" (citations omitted)); *Rockwell v. CIR*, 512 F.2d 882, 885 (9th Cir. 1975); *Valetti v. CIR*, 260 F.2d 185, 187 (3d Cir. 1958) ("It is the burden of a taxpayer who institutes such a suit as this to overcome the presumption that the Commissioner's deficiency finding was correct by showing by a preponderance of evidence that the Commissioner erred."); 10 J. Mertens, Federal Income Taxation § 55.18, at 113–14 and cases cited (1970).

The taxpayers rely upon *McSpadden v. CIR*, 50 T.C. 478, 491–94 (1968) and *Wilson v. CIR*, 25 T.C. 1058, 1066 (1956) for the proposition that when the Commissioner departs from the grounds relied on in his deficiency notice to sustain a theory later raised, he has the burden of proving any new matter. While the Commissioner here did contend below that the entire transaction lacked bona fides and the Tax Court agreed, which would have resulted in the application of ordinary income tax liability for the entire proceeds of the sale, Judge Raum expressly limited the Commissioner to its previous deficiency notice. Hence we have no occasion to decide whether the Commissioner carried any burden of establishing that no bona fide sale at all took place. The burden of establishing what was a fair market value therefore remained with the taxpayer.

■ As we indicated in *Berenson*, the test to be applied in determining the extent of capital gains treatment is the establishment of the fair price which a non-exempt entity would pay for the stock in an arm's length negotiation. Here the taxpayers had the unique ad-

---

5. After the opinion below was filed, the Commissioner, no doubt prompted by the opinion's finding that no bona fide sale existed, moved to amend its answers to so allege. The motions were summarily denied by Judge Raum on July 26, 1974.

vantage of being able to show that Wilson, just 15 days before Cathedral received its assignment, was willing to pay the same price on practically identical terms.[6] But not only was there no evidence of the Wilson-Kraut negotiations, the record is also barren of any proof that Wilson even exists or if it does, that it is a non-tax-exempt entity. The agreement assigning Wilson's contract of sale to Cathedral not only fails to provide any financial consideration for the assignment by Wilson but it is not even signed by any Wilson representative. (The original contract between Nassau and Wilson is signed by one Leon Lautin on the latter's behalf but no corporate title is indicated.) Judge Raum noted below: "In the absence of any explanatory evidence (which was peculiarly within the control of petitioners) and in view of the two contracts' all too convenient timing, it is strongly suggestive [sic] the initial Wilson contract was merely a bootstrap effort to bolster petitioners' contention as to Nassau's fair market value, and we consequently must discount its evidentiary value." 62 T.C. at 431.

▇ The only evidence presented by the petitioners below as to Nassau's fair market value was the testimony of Aaron Kraut, who testified that, on the basis of consumer acceptance of Nassau's new wire and unfilled orders for the first half of 1966, he anticipated gross profits of more than $10,000,000 during the next ten years. No documentary evidence of any sort was submitted in support of this estimate. Moreover, Judge Raum held "we . . . simply do not believe this evidence." He characterized Kraut's

memory of the transaction as "narrowly selective and seemingly self-serving . . . we are hardly inclined to credit Aaron Kraut with the necessary knowledge or ability to lend the slightest probative value to his testimony." 62 T.C. at 430–31.[7] In view of Judge Raum's opportunity to observe the demeanor of the witness we obviously cannot characterize this finding of fact as clearly erroneous. CIR v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Adler v. CIR, 422 F.2d 63, 68 (6th Cir. 1970) (credibility of witnesses is particularly for the Tax Court); Casey v. CIR, 267 F.2d 26, 31 (2d Cir. 1959) (same) (dictum). Finally, the fact that a tax-exempt organization was willing to pay a maximum price of $3,500,000 for the stock was obviously not probative of its value to a non-tax-exempt entity.

On appeal, the taxpayers urge that Judge Raum did not sufficiently recognize that Nassau had a "valuable trade secret for the production of a dramatically new type of Christmas tree lighting wire." On the contrary, Judge Raum found that there was no convincing evidence that the production of the wire was based on a secret process and further noted that Nassau had no patent protection for its "secret". Nassau's competitors were free to appropriate the process and Nassau's short-lived success would tend to support the argument that this eventually happened by 1968. It is also significant that Kraut testified that the new plastic material was an "unknown quantity" and that after discussions with his accountant and attorney decided "we would be complete idiots to take a chance on putting—producing this

---

6. The only difference was that Wilson had agreed to pay the taxpayers 75% of its pre-tax earnings for five years and thereafter 75% of its after-tax earnings, while Cathedral had agreed to pay 75% of its pre-tax income for the entire ten-year period.

7. In addition, Judge Raum noted that another Kraut, Aaron's brother Harry, was actually the witness the government had subpoenaed to appear at the trial. The government did not attempt to enforce its subpoena in part be-

cause petitioners represented that Aaron was as knowledgeable as Harry as regards the details of Nassau's business. However, on the stand Aaron at times professed ignorance of Nassau's financial concerns, explaining that Harry and not he himself handled all financial matters for the company. 62 T.C. at 430. Judge Raum concluded this point by saying, " . . . we simply note that petitioners must bear the consequences of their failure to adduce credible evidence of Nassau's value." Id. at 431 n.7.

material in Trio Wire and jeopardizing the corporation."

The other evidence of value is supportive of the view that the Commissioner's valuation of $168,445.60 for the Nassau stock is not clearly erroneous.[8] In the one-year period of its existence prior to sale, it had a taxable income of less than $16,000; its total assets were slightly in excess of $50,000, most of which consisted of accounts receivable. Its only owned asset was a used automobile. It leased the building in which it operated and the only equipment utilized in manufacturing the Christmas decoration wiring, the extruder, was leased from Trio at $500 a month. Although Nassau's earnings rose rapidly after the sale to Cathedral, and the Krauts received $1.48 million under the contract, the company suffered a precipitous drop in income that could not have been wholly unexpected given the failure to attempt to patent the "unique" process. By 1969, Nassau had ceased all operations.

It is true that the Tax Court made no specific finding that the true value of Nassau was $168,445.60 since it found that the sale was not bona fide. However, it did accept the deficiency assessment of the Commissioner and the taxpayer failed miserably to shoulder the burden of establishing that this was erroneous. A casual reading of its opinion indicates that the Tax Court, had it anticipated *Berenson's* requirement of an apportionment, would have found Nassau's value to be, if anything, less than that determined by the Commissioner. The Commissioner's evaluation was based upon a formula of ten times Nassau's taxable income for the fiscal year ending on June 30, 1966. Judge Raum

pointed out, however, that this would result in a price of $158,315.60 since Nassau's taxable income for 1966 was only $15,831.56. He further noted that the usual method of computing value in terms of a multiple is to employ an *after* tax earnings figure which would yield a value of $123,486.20. He explicitly noted that a greater multiple than ten would not be justified since the stock was closely held, the company's net assets were modest, its history brief and its sole product was untested over a sufficiently lengthy period. While the Commissioner's findings on valuation were far less specific than those presented in *Berenson*, where an expert witness testified as to a detailed formula for estimating the price that would be paid by a non-exempt purchaser, those findings must stand in light of appellants' failure to present any countervailing evidence. We see no advantage in remanding for a specific finding of value by the Tax Court since it could not be any greater than that found; if less, both the Tax Court and this court would be bound by the Commissioner's initial determination. In any event, neither party has sought such a remand.

Finally, taxpayers argue that the fair market value of the Nassau stock could not be less than forty-eight percent of the price which Cathedral agreed to pay since in 1967 the corporate tax rate was forty-eight percent on profits in excess of $25,000. We fail to see any nexus between a non-exempt entity's tax bracket and the price a tax-exempt entity might be willing to pay. There is no such limitation in *Berenson* and no authority is cited for the proposition.

We affirm.

8. We note that, in general, a trial court's evaluation of stock or other property is subject to reversal only if it is clearly erroneous. E. g., *Bormes v. CIR*, 512 F.2d 442 (8th Cir. 1975) (*per curiam*) (affirming valuation of real estate donated to charity, where Tax Court sustained the Commissioner's valuation); *Rubber Research, Inc. v. CIR*, 422 F.2d 1402, 1405 (8th Cir. 1970) (per Blackmun, *J.*) (valuation of stock for tax purposes is a question of fact, and hence is subject to the "clearly erroneous" standard of review); *Seas Shipping Co. v. CIR*, 371 F.2d 528, 532 (2d Cir.), cert. denied, 387 U.S. 943, 87 S.Ct. 2076, 18 L.Ed.2d 1330 (1967) (same).