Louis BERENSON and Sue A. Berenson, Sam Cohen and Sarah Cohen, Isidore Cohen and Pauline Cohen, David Cohen and Marilyn Cohen, and Sam Cohen and Isidore Feldman, Executor of the Estate of Sarah Cohen, Deceased, Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellant.

No. 26, Docket 79–4058.

United States Court of Appeals, Second Circuit.

Argued Sept. 24, 1979.

Decided Dec. 28, 1979.

William S. Estabrook, III, Atty., Tax Division, Dept. of Justice, Washington, D. C. (M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Michael L. Paup, Attys., Tax Division, Dept. of Justice, Washington, D. C., of counsel), for appellant.

Eli Uncyk, New York City, for appellees.

Before MOORE, OAKES and NEWMAN, Circuit Judges.

OAKES, Circuit Judge:

This tax case has a rather remarkable and lengthy history. It reaches us on appeal following a previous remand to the Tax Court, *Berenson v. Commissioner*, 507 F.2d 262 (2d Cir. 1974). When this matter first arose, the Tax Court originally held that a "sale" to a tax-exempt purchaser was not a "sale" for purposes of Section 1222(3); thus, the proceeds were ordinary income to the taxpayers. *Louis Berenson*, 59 T.C. 412 (1972). Applying *Commissioner v. Brown*, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965), this court affirmed in part and reversed in part, holding that a portion of the proceeds was includable within a Section 1222(3) "sale" and hence taxable as capital gain, 507 F.2d at 268, but that the excess of the proceeds received by the selling taxpayer over what a nonexempt purchaser would have agreed to pay under comparable terms and conditions of payment was taxable as ordinary income. This court remanded to the Tax Court to determine with precision the amount that a nonexempt purchaser would have been willing to pay "under identical terms." *Id.* at 268–69.

On remand, the Tax Court, William H. Quealy, Judge, in attempting to comply with this court's instructions, accepted the testimony of the Commissioner's expert as to the fair cash value of the business at the date it was sold. Then the Tax Court applied a 20% discount rate to the stream of payments comprising the consideration actually agreed upon by the tax-exempt buyer Temple, a discount rate culled from testimony by a witness of the taxpayer and not disputed—even explicitly discussed—by the Commissioner's own expert witness. Because the resulting figure so discounted was less than the estimated fair market value of the business, the Tax Court consequently

found that there was no ordinary income in the transaction whatsoever. 37 T.C.M. 415 (1978). The Tax Court subsequently denied the Commissioner's motion to reopen the record based upon an affidavit of his same expert that the 20% discount rate was not the one that should have been used for this transaction, and the Commissioner appealed. Because we find that the Tax Court did not explicitly follow the mandate of this court in *Berenson v. Commissioner, supra,* we reverse and remand again. We do so noting, however, that to a certain extent, Judge Quealy was led into confusion by problems inherent in the remand as well as a lack of clarificatory testimony by the expert witness which might have been had if trial counsel for the Government had anticipated those inherent problems.

THE FACTS

The facts in this case are fairly straightforward and have already been recounted in *Berenson v. Commissioner, supra.* We will restate them briefly here.

On December 31, 1965, Louis Berenson et al., taxpayers, owners of all the capital stock of two women's sportswear corporations—Kitro Casuals, Inc., and Marilyn Togs, Inc.—sold all of their stock in these corporations to the Temple Beth Ami (Temple), a federally tax-exempt nonprofit religious corporation (I.R.C. §§ 501(a), (c)(3), 511(a)(2)(A) ). The sale was for $6 million gross to be paid according to a fixed schedule of gradually increasing quarterly installments, with interest at 4%, no initial down payment, the first installment due at the end of the first quarter of 1966, and installments of principal continuing through 1976, with payment of $1 million over that year, followed by payments of $920,000 each in 1977 and 1978 covering the 4% interest. The stream of payments were thus to total $6 million in principal over eleven years, or $7,840,000 of principal and interest over thirteen years. Additional terms of the sale were that 4.5% of the net profits of the partnership established by the buyer Temple would be paid to a finder as his fee; taxpayers were to be employed as the managers of the business partnership; in the

event of nonpayment by Temple, taxpayers' sole remedy was to have returned to them the capital account in the business formerly conducted by their corporations, with none of Temple's other assets liable to cover the purchase price obligations; and in the event that 80% of Temple's distributive share of the partnership's net profits for a given quarter exceeded the payments due to taxpayers, the excess would constitute prepayment of future installments due taxpayers in inverse order of maturity. The tax years in question are 1966 through 1968, 1969 and thereafter being no longer involved by virtue of the Tax Reform Act of 1969, through which Congress plugged the "loophole" enabling tax-exempt corporations to avoid paying taxes on unrelated business income. *See Berenson v. Commissioner, supra,* 507 F.2d at 266–67.

As stated above, the Tax Court originally found that there was no "sale" within the meaning of § 1222(3), on the basis that the purchase price negotiated between the sellers and the tax-exempt purchaser was double the amount that a nonexempt purchaser would have agreed to pay under comparable conditions. *Louis Berenson,* 59 T.C. 412 (1972). The Tax Court thereby upheld the Commissioner's determination that payments to taxpayers during the years in question were taxable as ordinary income rather than capital gains. A panel of this court reversed, however, on the basis of *Commissioner v. Brown,* 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965) (*Clay Brown*), which held that a sale and leaseback transaction was a sale even though the purchasing tax-exempt organization, like the Temple here, had no downside risk in entering the transaction. In *Clay Brown,* the Court held that since the negotiated purchase price of cash and securities was within a reasonable range of what it should have been in light of the earnings history of the corporation and the adjusted net worth of the corporate assets, the price included an appreciation that had accrued to the selling corporation prior to the date of sale, which was therefore taxable only at capital gains rates. The panel of our court, in light of the Tax Court's finding that "the stated

price of $6 million was more than double the price that would be paid for the stock, on substantially the same terms by a prospective purchaser who was not exempt from the income tax," 59 T.C. at 416, held that only the difference between "a reasonable purchase price" that would be paid by a nonexempt purchaser and that which was to be paid by the tax-exempt Temple should be taxable as ordinary income. 507 F.2d at 268. Our court thereby affirmed the Tax Court's view that the transaction was not entitled to exclusive capital gains treatment, while reversing the Tax Court's determination that none of the proceeds qualified as capital gains. And although our court held that the Tax Court's finding (that "$6 million was more than double the price") was properly supported by the evidence, since an exempt purchaser would not have to pay taxes on the earnings out of which the purchase price was to be paid, this court also held that the finding was nevertheless insufficiently precise to permit a final disposition of taxpayers' deficiency assessments. Thus, the case was remanded for a further evidentiary hearing. *Id.* at 269. The Tax Court was directed to separate the purchase price into "the portion that is attributable to the accumulated value of the corporations at the time of the purchase and the portion attributable solely to the extra purchasing power possessed by Temple by virtue of its tax-exempt status." *Id.* at 269. This court held that taxpayers were "entitled to capital gains treatment on that portion of each of the payments here in issue which bears the same ratio to such payment as the gain, computed by subtracting Taxpayers' basis from the fair value to a nonexempt purchaser *under identical terms*, bears to the entire purchase price." *Id.* at 268 (emphasis added). On remand, the Tax Court said that, as a practical matter, there was no basis upon which any more precise finding could be made, because no purchaser could be presumed to be will-

ing to pay more than the fair market value of the business.

The Commissioner's own expert witness, Gilbert E. Matthews, a partner in Bear, Stearns & Co. of New York, testified to the validity of his written report to the same effect, stating that the fair market value of the stock to a non-tax-exempt purchaser at the date of sale would have been $2,300,000, a figure constituting 0.33 times sales for fiscal 1965, 11.3 times net income, and 7.8 times stockholders' equity. This opinion, based upon comparable acquisitions in the apparel field, was largely unchallenged and ultimately accepted by the Tax Court. Neither Matthews nor the two taxpayers' witnesses made a determination as to what a nonexempt purchaser would have paid with payments made, as they were here by Temple, on a contingent basis stretched out over a period of eleven years.[1]

The Bear, Stearns & Co. report did refer to the possible payment of a premium by a buyer with a tax loss carry-forward, even though tax loss carry-forwards were for the most part limited to five years, but the report did not attribute any unique quality or predictability to the tax loss context which would warrant the payment of such a premium, particularly in the instant case. The report also went on to say, with reference to our court's remand for finding "fair value to a nonexempt purchaser under identical terms," that "in our judgment, the fair value of the Company is not dependent upon the terms of payment" and that "the total present value of such stream of payment should be equivalent to the fair value of the consideration which a purchaser would pay if the entire payment were made at the time of purchase." The report concluded that "to the extent that certain future payments are contingent, the present value of such contingent payments should be discounted to reflect the probability of ultimate receipt by the seller." Bear, Stearns & Co., Valuation Report 9.

---

1. For purposes of determining the purchase price agreed to by Temple, the interest payments should not be included as part of that price, in that they would automatically receive ordinary income treatment. The Tax Court on remand appears to have added the interest payments to the principal payments in calculating the price, a computation not called for by either the first Tax Court decision or *Berenson v. Commissioner*, 507 F.2d 262 (2d Cir. 1974).

Matthews' testimony before the Tax Court was consistent with his report. A number of his comparable transactions were "to some degree on an earnout basis," Joint App. at 235, that is, when additional payments would occur in subsequent years only if earned. And while he said that his comparable transactions involved purchases by companies in related businesses that could handle any risk with respect to management leaving, *id.*, no one, including the Tax Court or Commissioner's counsel, attempted to assess the Temple on that basis. Matthews also indicated that a buyer might pay more to the seller to compensate him for the risks of contingent future payments, to reflect the probability of the seller ultimately receiving them, but that the buyer also runs the risk of the company's less than adequate income over time, so that a future stream of payments as opposed to an immediate cash payment can cut both ways. *Id.* at 236. In connection with these considerations underlying the choice of a proper discount rate, Matthews cited the testimony of an earlier witness of the taxpayer as follows:

> In the testimony earlier by Mr. Wray, he mentioned the fact that he would consider using a twenty percent discount rate in a transaction such as the one under review today. If we were to discount the stream of payments to be paid to the sellers in the Kitro-Marilyn Togs transaction at a twenty percent rate, the present value of that $7,840,000.00 reduces to $2,112,000.00. And I think the twenty percent number which Mr. Wray used by coincidence is the number that I based my calculations on prior to coming here today.

*Id.* at 236–37.

Although it is uncertain whether Matthews was specifically adopting the 20% discount rate as the proper figure in the instant valuation, his statements seem to suggest a certain approval of the 20% rate.

But at no point during Matthews' testimony was he explicitly asked to compare the price that a nonexempt purchaser would pay on terms similar to those negotiated between taxpayers and the Temple, nor was he asked whether he thought the 20% discount rate was fair and appropriate for the tax-exempt purchaser where the purchase price was secured only by the assets transferred. What becomes apparent is that, as a practical matter, it is impossible to compare the actual cash value of a going business, which assumes risk on the part of the purchaser, *i. e.*, that he might lose the cash paid, with a transaction such as this one, which involves *no* risk on the part of the purchaser, since the purchase price is wholly and only payable out of future earnings which are always and by definition contingent. The Tax Court recognized this in a way by saying that a nonexempt purchaser could be assumed willing to purchase the business out of projected future earnings *only after* first deducting income tax, which would therefore reduce the total amount to be paid in any one year exclusive of interest by about one-half. But the Tax Court ultimately did proceed, following the Commissioner's expert's lead, to determine first the fair market value of the property sold (a figure which does involve downside risk), and then a present value of the stream of payments agreed to by Temple. The Tax Court disregarded the testimony of the taxpayers' two experts and accepted the Commissioner's expert's figure of fair market value, as of December 31, 1965, of $2,300,-000. The Tax Court also utilized the 20% discount rate suggested by taxpayers' Mr. Wray and seemingly approved by Mr. Matthews to calculate the present value of the total Temple payments stream of $7,840,-000, which produces a figure of $2,112,000. Incredibly, the Commissioner requested that the Tax Court accept this testimony as a basis for its findings, and the Tax Court agreed to his request. The Commissioner now, on further reflection, realized that this testimony means a finding of no ordinary income at all, a result opposite to that argued by the Commissioner.[2] To this point,

2. We suppose it is possible that what the Commissioner thought in making such a request

was that it would result in $5,540,000 of the total consideration being taxable as ordinary

however, the distinction between a fair market valuation involving a downside risk and a future discounted earnings valuation involving no such risk has escaped the Commissioner.

Displaying the generally slow nature of this proceeding in the Tax Court, the Commissioner, some six months after the decision on remand was handed down, moved for reconsideration, pointing out that his requested finding with regard to the present value of $2,112,000 was made improperly and without adequate basis, because Matthews was not in fact suggesting that specific discount rate on the subject payments as the proper one, or referring precisely to this transaction. Attached to the motion for reconsideration was an affidavit of Matthews, to the effect that he did not take into account the facts of this very case, where the contingent payments were secured by a business with a present fair market value of $2.3 million. The affidavit also stated that his testimony about the 20% rate resulted from the fact that it had been mentioned previously in the proceeding; he never intended to imply that the 20% rate was the one that should be used for the transaction. Indeed, he had prepared a schedule for the remand trial on the basis of various discount rates of 6, 8, 10, 12, and 20%.[3] The affidavit went on to state that the appropriate discount rate should be between 9 and 10%, and that the stream of payments, considering that they were partially secured by the property, was worth $3,800,000.[4] The Tax Court denied the motion, saying that it was "not in agreement with the opinion [of the court of appeals], and my opinion is predicated on the . . basic proposition that there really wasn't a sale here." Joint App. at 302. But the judge went on to say that, since the value of the consideration actually paid and what the stock was worth come out about the same, there was nothing left to tax. The

judge himself best put it, perhaps, when he said to Commissioner's counsel, "I took their [court of appeals] opinion literally, and I took your witness literally, and your brief literally, and I concluded that that foreclosed any income which could be taxed at normal rate, other than the deferment." *Id.* at 304. The motion was denied as an exercise of discretion; as the judge commented, "my discretion says that six months have elapsed, and it's time this case moved onto a higher plateau." *Id.* at 306.

## DISCUSSION

It is plain enough that, whatever the Tax Court may have thought it was doing, it did not comply explicitly with this court's directions on remand. Those directions contemplated determining what a nonexempt purchaser would have paid "under identical terms." 507 F.2d at 268, 269. Such a determination would necessarily be hypothetical—perhaps even impractical—given the state of the art of business valuation and financial projections, an art which is not within a court's ordinary ken. But the computation sought after was a comparison between what a nonexempt purchaser and an exempt purchaser, in this case Temple, would pay for the stock out of prospective earnings, with no downside risk, earnings on which the nonexempt purchaser would properly be taxed at ordinary income rates.

One way the Tax Court could have complied with the "identical terms" mandate was to consider expert testimony, on what a nonexempt purchaser would pay for the stock on the "identical terms" of the instant transaction. "Identical terms" would include at least the following: no down payment; payment solely out of earnings and contingent upon those earnings; and payment of principal quarterly with payments the first two years of 5% of principal, 6⅔% for each of the next three years, 8⅓% for the next year, and 10% for the following

income, *i. e.*, the difference between $7,840,000 and $2,300,000.

**3.** The schedule was attached to his affidavit, but his testimony, it will be recalled, referred only to the 20% figure.

**4.** The affidavit did not mention any part played by the fact that Temple had no obligation other than to pay the price out of earnings of the business. None of its other assets was reachable.

year; 11⅔% for the following three years, and a final payment of 16⅔% of principal in the eleventh year, followed by two additional years of payment of interest at 4%.[5] In addition, the terms of the deal would involve securing the transaction by, but only by, the assets of the business itself, and would contemplate a finder's fee, hiring the selling taxpayers as managers of the business, a fifty-fifty division of net profits with the finder in and after the third year following the final payment of interest to the sellers.[6] The only nonidentical term here is that such payment would be made by a nonexempt taxpayer who should be assumed not to have available a tax loss carry-forward. Quite obviously, then, any projection of earnings in such a hypothetical sale would have to contemplate payment of federal income taxes on the business's income prior to payment to the seller. We cannot believe that it is impossible to make such a projection.[7]

To be sure, this is not exactly what a willing taxable buyer would pay to a willing seller; obviously, if a seller could get a higher price from an exempt purchaser (which the previous opinion of this court contemplated he could in the tax years here in question), he would prefer to set his price at a higher level presumably acceptable to the exempt purchaser, and therefore be unwilling to sell to the nonexempt purchaser not meeting the higher price. Or if he could get the same price but receive it from an exempt purchaser more quickly he presumably would make that deal as opposed to one with a nonexempt buyer. A seller seeking to sell to a non-taxpaying buyer can structure the transaction to receive more than he would selling to a taxpaying buyer, the net payment being greater by the

5.

| Year | Annual Amount to be Paid | Quarterly Amount to be Paid | Allocation Between Interest and Principal |
|---|---|---|---|
| 1966 | $ 300,000 | $ 75,000 | Principal |
| 1967 | 300,000 | 75,000 | Principal |
| 1968 | 400,000 | 100,000 | Principal |
| 1969 | 400,000 | 100,000 | Principal |
| 1970 | 400,000 | 100,000 | Principal |
| 1971 | 500,000 | 125,000 | Principal |
| 1972 | 600,000 | 150,000 | Principal |
| 1973 | 700,000 | 175,000 | Principal |
| 1974 | 700,000 | 175,000 | Principal |
| 1975 | 700,000 | 175,000 | Principal |
| 1976 | 1,000,000 | 250,000 | Principal |
| 1977 | 920,000 | 230,000 | Interest |
| 1978 | 920,000 | 230,000 | Interest |
| Total Payments | $7,840,000 | | |

507 F.2d at 264 n.3.

---

6. Similar provisions were in the Temple contract, *Berenson v. Commissioner*, 507 F.2d 262, 264 (2d Cir. 1974), but the fifty-fifty division 14 years after the contract was not mentioned in the testimony.

7. In reality the contemplated projection involves primarily two variables. The first is an estimate of the future earnings of the business. Once the expert determines that figure, it is simply a matter of calculation for him to determine what amount of the future earnings would be available, after taxes, to meet the yearly percentages of principal payments specified in the transaction that actually occurred. Of course, the sum of those payments is not necessarily the only price that a taxpaying purchaser would be willing to agree to in order to achieve the chance of acquiring the business.

With no downside risk to himself, the taxpaying purchaser might be willing to agree to a somewhat higher price on the chance that the business might do better than expected. Thus, the second variable is an estimate of how much better it was reasonably likely that the business might do than would have been forecast at the time of the sale. For example, an expert might think a business would earn $5 million in ten years and also believe that there is a reasonable probability that earnings might be as high as $6 or $7 million. Since the purchaser has nothing to lose (except his share of the transaction costs), he might, in order to gain an opportunity to acquire the business, agree to a price somewhat higher than simply the total forecast after-tax earnings.

amount of taxes that would normally be paid, or he can receive the same amount more quickly for the same reason.

In rejecting the Commissioner's motion, the Tax Court seemed to quarrel with the decision of this court in the first instance, if not with that of the Supreme Court in *Clay Brown, supra,* still viewing the "sale" as a sham, and denying the motion more on the basis of its lack of timeliness than on its insufficiency. Considering that the decision of the Tax Court itself did not come down until March 6, 1978, over three years after this court's initial remand, a few months more time at the expense of accuracy does not seem to us that significant. And we respect the element of unreality that the Tax Court sees implicit in the case; we see it there too.

Our previous opinion suggested that the price paid here was in all probability artificially high. Whether or not Temple paid twice as much as a nonexempt purchaser would pay is impossible for us to say here. Clearly, there was an ongoing business being sold that had value. What our court attempted to do in our previous opinion, as we felt required to do by *Clay Brown, supra,* was to get the Tax Court to separate the real value from the artificial value. This has not yet been done. It may have to be done with a hypothetical construct that valuation experts may find difficult, even impossible to make. Until a further attempt has been made, however, we continue to think it can be done.

Reversed and remanded in accordance with opinion.