LOUIS BERENSON and SUE A. BERENSON, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Berenson v. Commissioner
Docket Nos. 3677-70, 6069-70, 6088-70, 6116-70, 2920-71, 3870-71.
United States Tax Court
T.C. Memo 1978-89; 1978 Tax Ct. Memo LEXIS 424; 37 T.C.M. (CCH) 415; T.C.M. (RIA) 780089; March 6, 1978, Filed Isidore Feldman, for the petitioners. Marwin A. Batt and Bernard S. Mark, for the respondent. QUEALY
SUPPLEMENTAL MEMORANDUM OPINION QUEALY, Judge: This proceeding arises out of the remand of this Court's opinion by the United States Court of Appeals for the Second Circuit. . The petitioners owned all of the stock of Kitro Casuals, Inc., and Marilyn Togs, Inc., both New York corporations engaged in the design, manufacture and marketing of women's sportswear. As of December 31, 1965, petitioners transferred the stock in these *426 corporations to the Temple Beth Ami, a nonprofit religious corporation located in Philadelphia, Pennsylvania. In accordance with the agreement between petitioners and the Temple, the stated consideration for the sale of the stock was $6,000,000, payable solely out of the earnings of the business over a period of 13 years, with stated interest at 4 percent per annum, to be paid in accordance with the following schedule: Annual Amount
Quarterly Amount
Allocation Between Year
to be Paid
to be Paid
Interest and Principal
1966
$ 300,000
$ 75,000
Principal
1967
300,000
75,000
Principal
1968
400,000
100,000
Principal
1969
400,000
100,000
Principa l
1970
400,000
100,000
Principal
1971
500,000
125,000
Principal
1972
600,000
150,000
Principal
1973
700,000
1 75,000
Principal
1974
700,000
175,000
Principal
1975
700,000
175,000
Principal
1976
1,000,000
250,000
Principal
1977
920,000
230,000
Interest
1978
920,000
230,000
Interest
Total
$7,840,000
Payments
The Temple was exempt from Federal income tax under section 501(a) and section 501(c)(3), and since it was a "church" within the meaning of section *427 511(a)(2)(A), was also exempt from the tax imposed by section 511(a)(1) on the unrelated business taxable income of some exempt organizations. Following the acquisition of the stock by the Temple, the corporations were dissolved and the business was continued by a limited partnership in which the Temple was a limited parnter and the broker, who arranged for the transaction, was a general partner entitled to an interest of 4 1/2 percent until all obligations had been paid. In consideration of the facts that the stated price greatly exceeded the value of the business sold, the payments to be received by the sellers were dependent upon future earnings, the services of the principal managing stockholders were required in the operation of the business, and there was no fixed obligation on the part of the purchaser to pay anything except out of earnings, this Court in its original opinion chose to disregard the sale. In substance, we held that the transaction was more in the nature of a sale by the Temple of its exemption rather than a purchase by the Temple of the dress business. The Court of Appeals did not agree and remanded the case for further proceedings consistent with its *428 opinion. The parties interpret that opinion differently. Accordingly, it is necessary at the outset to consider the direction to us by the Court of Appeals. In its opinion, the Court of Appeals assumed that the transaction in question reflected both an appreciation in the value of the stock of the dress companies, on account of which petitioners were entitled to be taxed as a gain upon the sale of a capital asset within the meaning of section 1222(3), and an additional payment attributable to the fact that the Temple, as purchaser of the business, was in the position to return the earnings of the business to the petitioners without the payment of any income tax thereon. The Court of Appeals thus stated: As pointed out earlier, the Supreme Court said that the result contended for by the Commissioner in Clay Brown would amount to a significant invasion of the policy underlying the capital gains provisions, i.e., the policy to mitigate the harshness of taxing the entire amount of appreciation in value accruing over an extended period of time in the tax accounting period in which a final disposition of such property is made. The Tax Court's implied, but inexact, finding concerning *429 the value of the business in the instant case means that there was substantial, although not precisely determined past accrued appreciation in Taxpayers' stock. As a consequence, the Tax Court's ruling that all gain should be denied capital gains treatment defeated this purpose since it characterized the entire amount of Taxpayers' gain as ordinary income. We, therefore, believe that a "sale," within the meaning of § 1222(3), has indeed occurred here and that the amount realized on such sale must include such amounts of the agreed upon purchase price as represent the appreciation in the value of Taxpayers' businesses that had accrued up to the date of sale. Taxpayers are, we hold, entitled to capital gains treatment on that portion of each of the payments here in issue which bears the same ratio to such payment as the gain, computed by subtracting Taxpayers' basis from the fair value to a nonexempt purchaser underidentical terms, bears to the entire purchase price. The balance, to the extent that it exceeds Taxpayers' basis and the portion entitled to capital gains treatment, is taxable as ordinary income. (Italics added) And again, in a concluding statement with respect *430 to this issue, the opinion of the Court of Appeals is, as follows: In sum, we conclude that the portion of the purchase price agreed to by Temple and Taxpayers that is in excess of the price a nonexempt purchaser would have paid underidentical terms is not part of the proceeds of a § 1222(3) "sale," and is, therefore, taxable as ordinary income to the recipients. (Italics added) Finally, in reversing in part and affirming in part the decision of this Court, the case was remanded for the taking of additional evidence and findings, with the following explanation: Although the Tax Court has found that the purchase price agreed to was substantially in excess of the price that would have been negotiated with a nonexempt purchaser underidentical terms, and its finding is properly supported by the evidence of an expert witness, the finding is not precise enough to permit a final disposition of Taxpayers' deficiency assessments without a further evidentiary hearing. It will be necessary for the Tax Court, as a beginning computation, to separate the purchase price into the portion that is attributable to the accumulated value of the corporations at the time of the *431 purchase and the portion attributable solely to the extra purchasing power possessed by Temple by virtue of its tax-exempt status. (Italics added) As a practical matter, there is no basis upon which the Court can find the amount which would be paid by a nonexempt purchaser for these businesses in this type of transaction with any more exactitude than was stated in our original opinion. As was testified to by one of the witnesses, no purchaser could be presumed to be willing to pay more than the then fair market value of the business. Starting from that assumption, the total amount paid will depend upon the terms of the sale. A nonexempt purchaser could be assumed to be willing to purchase the business out of projected future earnings after first deducting the income tax. Roughly, this would reduce the total amount to be paid (exclusive of interest) by approximately one-half. It could be assumed, therefore, that such a purchaser would be willing to pay over to the petitioners $3,000,000 out of future earnings, plus the same interest, over the same period.If such a purchaser has a five-year loss carryforward, the total amount might be increased by an additional $900,000, on the *432 assumption that for the first five years such purchaser would be willing to pay over the amounts called for in the contract with the Temple. In determining this total, the Court did not take into account the risks of this business as distinguished from the willingness of the Temple to make available its inexhaustible exemption. It was a business solely dependent upon management and the vagaries of the market. Counsel for petitioner aptly described the risks, as follows: MR. FELDMAN: Your Honor, in the apparel business, this year's good operator is next year's marginal operator and two years from now, he's hanging on the ropes and three years he's broke unless there's good management. On the other hand, it is possible on the basis of the existing record first to find the fair market value of the property sold, that is the common stock of two corporations engaged in the design, manufacture and sale of women's sportswear, as of the date of the sale. From this it can be determined what proportion of the extended payments would have a present value equal to the fair market value on the sale date. The amounts thus determined would be taxable (except for the interest factor) as *433 income from the sale of property entitled to capital gain treatment. Any excess would be taxable as ordinary income. We will proceed on that basis. The petitioners presented the testimony of Marc Wray, a witness whose qualifications as an expert resulted from having represented a corporation with an unused loss carryforward in the acquisition of other businesses. As such, he had participated in the acquisition of several women's apparel businesses. Assuming a realistic projection of earnings, and a prospective buyer with an unused 10-year loss carryforward sufficient to shelter such earnings from the income tax, the witness testified that the stated price of $6,000,000, to be paid solely out of the earnings of the business to be acquired, was "reasonable." The basis for his testimony may be summarized in the following colloquy: THE COURT: * * * as I understand, all the witness is saying is that if the earnings projection were realistic, an exempt buyer or a buyer with a ten year loss carry forward could be found, why the buyer would be willing to shoulder [shelter] the earnings long enough to get that much money back. Isn't that the whole foundation of this, Mr. Wray? *434 THE WITNESS: That's correct. As was pointed out by the Court, all this witness testified to was that on the terms and conditions of the transaction involved in this proceeding, in a sale to a tax exempt buyer, such as the Temple, the business was worth what the Temple paid for it. As was pointed out to the witness, however, on December 31, 1965, there was no such thing as a corporation with a 10-year loss carryforward. The 10-year period resulted from an extension, later granted, for certain corporations with Cuban expropriation losses. Petitioner's other expert, Gilbert M. Haas, was an investment counselor and security analyst. He started out by annualizing earnings for the five months immediately preceding the date of sale without regard to the seasonal fluctuations of the business. To this he applied a price-earnings ratio of 20 times earnings. He subsequently modified his opinion by reconstructing hypothetical earnings to support his opinion. The Court would be unable to make a finding of value based upon his testimony. Respondent presented the testimony of Gilbert E. Matthews, a partner in the firm of Bear, Stearns & Co. This witness had considerable experience *435 in the valuation of businesses. After reviewing other transactions between companies in the apparel business, it was his opinion that the fair market value as of December 31, 1965, of the stocks of Kitro Casuals, Inc., and Marilyn Togs, Inc., was $2,300,000. He related this to the sale of 12 percent of such stocks in May of 1965, which indicated a value of $1,700,000 for the company as a whole at that time.
Mr. Matthews also placed a present (date of sale) value on the total payments of $7,840,000. Using a discount of 20 percent, he valued such payments at $2,112,000. The respondent has requested that the Court accept this testimony as a basis for its findings. Accepting the testimony of respondent's expert witness, the Court finds that the fair market value of the stocks sold by petitioners as of December 31, 1965, was $2,300,000. Likewise, as requested by the respondent, the Court finds that the then value of the payments to be made by the Temple was $2,112,000. Taking these findings together, it necessarily follows that there is no excess consideration to be paid by the Temple which might be attributable per se to its tax exempt status. The difference between the present *436 value of the business and the total price to be paid would be attributable to the conditional nature of the payments and the deferment of the dates of such payments over a period of years. Decision will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Sam Cohen and Sarah Cohen, docket No. 6069-70; Isidore Cohen and Pauline Cohen, docket No. 6088-70; David Cohen and Marilyn Cohen, docket No. 6116-70; Isidore Cohen and Pauline Cohen, docket No. 2920-71; Estate of Sarah Cohen, Deceased, Isidore Feldman, Executor, and Sam Cohen, docket No. 3870-71.↩