T.C. Memo. 1996-425



UNITED STATES TAX COURT



CHARLES L. FIELDS AND BARBARA S. FIELDS, Petitioners <u>v</u>.
      COMMISSIONER OF INTERNAL REVENUE, Respondent



Docket No. 26636-87.              Filed September 19, 1996.


        A, a corporation, agreed with P and Y to pay them
commissions on any oil that it purchased in foreign
countries as a result of their efforts.  P and Y
organized a Bermudan corporation, to which they
directed the payment of all the commissions.  <u>Held</u>:
The commissions attributable to P's services are
taxable to him under the assignment of income doctrine.
<u>Held</u>, <u>further</u>:  Ps failed to recognize dividend income
in the amounts set forth by R.  <u>Held</u>, <u>further</u>:  Ps
failed to recognize interest income in the amounts set
forth by R.  <u>Held</u>, <u>further</u>: P is liable for additions
to tax for fraud, and the 3-year period of limitation
under sec. 6501(a), I.R.C., does not bar the assessment
and collection of tax for any of the subject years.
<u>Held</u>, <u>further</u>:  P's wife is not an innocent spouse
under sec. 6013(e), I.R.C.

Lawrence F. Ruggiero and Robert Koppelman, for petitioners.[1]

Cheryl A. McInroy, Elizabeth A. Maresca, and

Steven D. Tillem, for respondent.

### MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  Charles L. Fields and Barbara S. Fields petitioned the Court to redetermine respondent's determinations with respect to their 1980 through 1982 taxable years. Respondent determined deficiencies of $525,389, $243,493, and $1,365 in their 1980, 1981, and 1982 Federal income taxes, respectively.  Respondent also determined that Mr. Fields was liable for a:  (1) $262,695 addition to his 1980 tax under section 6653(b), (2) $121,747 addition to his 1981 tax under section 6653(b), (3) $683 addition to his 1982 tax under section 6653(b)(1), and (4) time-sensitive addition to his 1982 tax under section 6653(b)(2) with respect to that year's entire deficiency. Respondent's determinations are reflected in a notice of deficiency dated May 14, 1987.

---

[1] Mr. Ruggiero and Mr. Koppelman entered the case on Apr. 17, 1995, and May 22, 1995, respectively.  Edward J. Daus, who prepared the subject petition, withdrew as petitioners' counsel on June 16, 1988.  Paul S. Haar entered the case on petitioners' behalf on Nov. 21, 1989, but withdrew on Feb. 14, 1990.  Mr. Haar also withdrew on Jan. 6, 1993, after he had reentered the case on May 14, 1990.

We must decide:

1.  Whether petitioners received commission income of $487,104 and $182,020 in 1980 and 1981, respectively.[2]  We hold they did.

2.  Whether petitioners received dividend income of $22,135 and $19,510 in 1980 and 1981, respectively.  We hold they did.

3.  Whether petitioners received interest income of $7,791, $37,612, and $8,429 in 1980, 1981, and 1982, respectively.  We hold they did.

4.  Whether Mr. Fields (petitioner) is liable for additions to his 1980 through 1982 taxes for fraud.  We hold he is.

5.  Whether the 3-year period of limitation under section 6501(a) bars the assessment and collection of tax for any of the subject years.  We hold it does not.

6.  Whether Mrs. Fields is an innocent spouse under section 6013(e).  We hold she is not.

Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the subject years.  Rule references are to the Tax Court Rules of Practice and Procedure. Dollar amounts are rounded to the nearest dollar.

---

[2] The notice of deficiency states that petitioners received commission income of $825,025 and $307,005 in 1980 and 1981, respectively.  Respondent has conceded that $337,921 and $124,985 of this income for the respective years was attributable to (and includable in the gross income of) petitioner's business partner, Dr. Walter F. Young.

## FINDINGS OF FACT[3]

### 1.  Overview

#### a.  General

Some of the facts have been stipulated and are so found. The stipulations and attached exhibits are incorporated herein by this reference.  Petitioners have been married for the last 33 years, and they resided in Rye, New York, when they filed their petition herein.  They are cash method taxpayers, and they signed and filed 1980, 1981, and 1982 Forms 1040, U.S. Individual Income Tax Return, using the status of "Married filing joint return".  Their 1980, 1981, and 1982 returns reported taxable income of $56,847, $71,010, and $5,550, respectively.  Gross (and adjusted gross) income for the respective years were reported as $86,153, $107,373, and $37,766.  Wages for the respective years were reported as $96,412, $111,652, and $40,166.

---

[3] Petitioner testified at trial.  Based on our observation of petitioner at trial, and following our review of the record as a whole, we conclude that petitioner's uncorroborated testimony is largely unreliable.  See Kraut v. Commissioner, 527 F.2d 1014, 1019 (2d Cir. 1975), affg. 62 T.C. 420 (1974); Pepi, Inc. v. Commissioner, 448 F.2d 141, 147 (2d Cir. 1971), affg. 52 T.C. 854 (1969); O'Connor v. Commissioner, 412 F.2d 304, 311 (2d Cir. 1969), affg. in part and revg. in part T.C. Memo. 1967-174; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

b.  Petitioner

Petitioner is well-educated in the intricacies of the business world, and he has been deeply involved in that world for almost 40 years.  He received a bachelor's degree in political science with a minor in business from Florida A & M University in 1958.  He received a master's degree in business from Columbia University Graduate School of Business in 1972.  He lectured at Northwestern University, Harvard University, University of Chicago, Florida A & M University, and Southern University in Louisiana, mainly on the procedures and policies for conducting business in Africa.  He taught as an adjunct professor in organizational behavior at the Graduate School of Business at Harvard University.  He consulted for the Commerce Department, on the topic of conducting business in Africa.  He served as an executive, during at least the subject years, advising management on development work and international trading.  He founded the National Black MBA Association.  He created the first database of minorities with bachelor's, master's, and Ph.D. degrees.

## 2.  Sales of Oil

BarSon International Ltd. (BarSon) is a Delaware corporation that was organized by petitioner and Dr. Walter F. Young (Dr. Young) on March 4, 1977, to provide consulting services for American corporations abroad and to entice American construction

companies to build in Africa.[4]  Dr. Young and petitioner are BarSon's president and secretary, respectively, and they each own 50 percent of its stock.  BarSon is a cash method taxpayer, and its taxable year ends on March 31.

On November 19, 1979, BarSon and Ashland Oil, Inc. (Ashland), entered a written agreement under which BarSon's managing directors (petitioner and Dr. Young) or other key employees would advise Ashland on starting business abroad (including the requirements for purchasing crude oil in foreign countries) in exchange for a daily fee of $750 plus expenses.[5] The agreement did not contain a provision for Ashland to pay BarSon commissions on the actual purchase of oil by Ashland. Petitioner and Dr. Young, on behalf of themselves, entered into a separate oral agreement with Ashland under which Ashland would pay commissions to petitioner and Dr. Young for any oil purchased as a result of their efforts.  Petitioners have never reported any income on their personal income tax returns for commissions

---

[4] Dr. Young is the brother of Andrew Young, the U.S. ambassador to the United Nations during the Carter administration.  The occurrences described below began at or about the time when Andrew Young led an official U.S. trade delegation (with petitioner and Dr. Young) to Africa to discuss oil and other matters.

[5] BarSon and Ashland amended this agreement on Feb. 1, 1981, to increase the daily rate to $1,250, with a minimum of $15,625 per month.  From 1979 until 1981, Ashland paid BarSon at least $713,765 under this agreement.  These payments were deposited into BarSon's bank accounts.

paid under the terms of the oral agreement with respect to petitioner's services.

In an attempt to secure large amounts of crude oil for Ashland, petitioner and Dr. Young traveled many times to Cameroon (at the instruction of Ashland), and they met with officials of Cameroon's national oil company, Société Nationale des Hydrocarbures (SNH). In March 1980, Ashland and Cameroon agreed that Ashland would acquire oil from SNH through Ashland's Bermuda subsidiary, Ashland (Bermuda) Limited (ABL).

At or about the same time, petitioner and Dr. Young decided that they wanted to organize a corporation in Bermuda or some other traditional tax haven to avoid Federal income tax on their commissions from Ashland. They contacted the law firm of Danzansky, Dickey, Tydings, Quint & Gordon (which was merged into Finley, Kumble, Wagner, Heine, Underberg & Casey on or about January 1, 1981, and which with its successor will hereinafter be referred to as Finley Kumble),[6] to obtain assistance in organizing such a corporation. Following discussions with petitioner and Dr. Young, Finley Kumble understood that

_____

[6] Although Danzansky, Dickey, Tydings, Quint & Gordon is a different firm than Finley, Kumble, Wagner, Heine, Underberg & Casey, the attorneys at these firms who advised petitioner and Dr. Young were generally the same throughout the relevant period herein. Robert B. Washington, Jr., one of the principal partners in charge of the accounts of petitioner, Dr. Young, and the related entities throughout the relevant time, oversaw and was actively involved in most (if not all) of the advice that the firms rendered to petitioner and Dr. Young, either personally or on behalf of their related entities.

petitioner and Dr. Young would render valuable management and consulting services to the foreign corporation as corporate employees, and that these services would result in substantial revenue. Finley Kumble anticipated that the corporation would distribute the revenue to Dr. Young and petitioner in the form of salaries over several years. Finley Kumble believed that, although the corporation would most likely be a "controlled foreign corporation" and a "foreign personal holding company", a careful structuring of the arrangement would allow petitioner and Dr. Young to escape the U.S. tax until they actually received their salary payments. Finley Kumble believed that the arrangement was subject to attack by the Commissioner under section 367 or 482, or by arguing doctrines such as: (1) Substance over form, (2) sham transaction, (3) assignment of income, or (4) deductibility of compensation. Finley Kumble relayed these understandings, anticipations, and beliefs to petitioner and Dr. Young. Petitioner and Dr. Young chose to organize the foreign corporation.

Finley Kumble, on behalf of petitioner and Dr. Young, contacted Max Quin (Mr. Quin), an attorney with a Bermuda law firm named Vaucrosson's, to organize the corporation because it was customary to use Bermudan counsel to organize a Bermudan corporation. On or about April 10, 1980, Mr. Quin organized the corporation for petitioner and Dr. Young under the name of

Cameroon Atlantis International (CAI).[7]  Finley Kumble helped Mr. Quin in the organization by relaying to him information from petitioner and Dr. Young.  Petitioner was very active in the organizational process.

CAI's address was Vaucrosson's address in Bermuda, and CAI was organized under the Companies (Incorporation by Registration) Act of 1970 (the Act) as an exempt company that could not hold land.  CAI's initial capital was 12,000 shares of stock with a $1 par value,[8] and all of its shares were issued to nominees for petitioner and Dr. Young.  Permission had been given on April 25, 1980, by Bermuda's Minister of Finance, to incorporate CAI as an exempt company, and CAI's memorandum of association was deposited in the Bermudan Office of the Registrar of Companies in accordance with the provisions of the Act, on April 28, 1980.  Upon its organization, petitioner and Dr. Young transferred to CAI their contractual right to receive commissions from Ashland on any barrels of oil purchased as a result of their efforts.

The sales of oil between ABL and Cameroon in 1980 and 1981 were accomplished through the use of back-to-back contracts involving CAI as an intermediary.  Under these contracts, CAI contracted with SNH to buy oil at a fixed price, and CAI

---

[7] CAI changed its name to Atlantis International Ltd. (Atlantis) on Feb. 14, 1981.

[8] Atlantis increased its share capital to $71,980 on Apr. 29, 1981.

contracted to sell that same oil to ABL for the same price plus a commission of 25 to 30 cents per barrel.[9]  ABL received 404,968 barrels of oil shipped from Cameroon on March 30, 1980, and ABL paid CAI a 30-cent-per-barrel commission (totaling $121,490) for this shipment.  The oil was purchased on the spot market, and local custom did not allow for a written contract on the delivery.

On April 10, 1980, CAI agreed to buy 190,000 metric tons of oil from SNH at a set price, with 120,000 of these metric tons to be delivered in April 1980 and the balance to be delivered in May 1980.  On April 21, 1980, ABL agreed with CAI to purchase the same oil at the same price plus a commission of 30 cents per barrel.[10]  Ashland arranged the terms for shipping the oil, it nominated the vessels used for lifting the oil, and it set the mode of payment for the oil.  Petitioner and Dr. Young arranged for ABL's purchase of the oil, and ABL paid them for their services by paying CAI the spread between the back-to-back contracts.  Commissions for the shipments under the April contract totaled $424,157.

On August 8, 1980, CAI agreed to buy 840,000 metric tons of oil from SNH at a set price, with equal monthly deliveries from

---

[9] CAI did not have the financial capacity to purchase the oil from SNH, and CAI had not entered into a consulting or agency agreement with ABL or Ashland.

[10] ABL received 457,680 barrels of the oil referred to in this contract on Apr. 15, 1980.

August 1980 through July 1981.  On August 8, 1980, ABL agreed with CAI to buy the same oil at the same price plus a commission of 25 cents per barrel.  Ashland arranged the terms for shipping the oil, it nominated the vessels used for lifting the oil, and it set the mode of payment for the oil.  Petitioner and Dr. Young arranged for ABL's purchase of the oil, and ABL paid them for their services by paying CAI the spread between the back-to-back contracts.  Commissions for the shipments under the August contracts totaled $1,064,424.  The last shipment under the August contracts was on March 3, 1981.

On January 1, 1981, CAI and ABL entered into a contract for the monthly purchase and sale of approximately 70,000 metric tons of oil for the 7-month period ended July 31, 1981.  ABL paid the set price directly to SNH, and ABL took delivery of the oil directly from SNH.[11]  ABL paid the per-barrel commissions directly to CAI.  Petitioner and Dr. Young arranged for ABL's purchase of the oil, and ABL paid them for their services by paying CAI the spread between the back-to-back contracts.

ABL paid commissions to CAI by check.[12]  All of these checks were payable to CAI and deposited into CAI's checking account (the C account) at N.T. Butterfield & Son Bank (Bank) in Bermuda.

---

[11] ABL put a provision in the back-to-back contracts that allowed it to pay SNH directly for the oil to ensure itself that the oil was paid for.

[12] All of the commissions were due to the efforts of petitioner and Dr. Young.

The following commission checks were deposited into the C account during 1980 and 1981:

| Date of Payment | Barrels | Commission | Amount | Date Shipped |
|---|---|---|---|---|
| Apr. 30, 1980 | 404,968 | .30/brl | $121,490 | 3/30/80 |
| May 12, 1980 | 457,680 | .30/brl | 137,304 | 4/15/80 |
| May 14, 1980 | 441,837 | .30/brl | 132,551 | 4/22/80 |
| June 20, 1980 | 514,339 | .30/brl | 154,302 | 5/13/80 |
| Sept. 17, 1980 | 546,934 | .25/brl | 136,733 | 8/20/80 |
| Oct. 9, 1980 | 508,128 | .25/brl | 127,032 | 9/11/80 |
| Nov. 10, 1980 | 476,470 | .25/brl | 119,117 | 10/11/80 |
| Dec. 11, 1980 | 516,144 | .25/brl | 129,036 | 11/11/80 |
| Jan. 12, 1981 | 515,671 | .25/brl | 128,918 | 12/12/80 |
| Feb. 2, 1981 | 536,050 | .27/brl | 144,734 | 1/3/81 |
| Mar. 6, 1981 | 515,455 | .27/brl | 139,173 | 2/4/81 |
| Apr. 2, 1981 | 517,336 | .27/brl | 139,681 | 3/3/81 |
| | | | 1,610,071 | |

Of the total commissions of $1,610,071, BarSon ultimately received $232,540 and $245,500 of this amount in 1980 and 1981, respectively, for a total of $478,040. Approximately $265,000 of this $478,040 amount was reported on BarSon's 1980 tax return.[13] BarSon never reported any other commissions as income on a Federal income tax return. The commissions that respondent seeks to attribute to petitioners have been reduced by the $478,040 of commissions reported by BarSon.[14] Respondent gave petitioners credit for $245,500 paid to BarSon in its 1981 taxable year, although BarSon never included this amount in its gross income.

_____

[13] This return reports that BarSon had $571,790 of total income and $57,483 of taxable income.

[14] Respondent further reduced the commissions reportable by petitioners for 1980 and 1981 by $337,921 and $124,985, respectively. See supra note 2.

## 3.  Finley Kumble's Legal Advice

On September 26, 1980, attorneys from Finley Kumble met with petitioner and Dr. Young in Washington, D.C.  Petitioner and Dr. Young believed that they had a tax problem with respect to funds brought from Bermuda into the United States, and they requested assistance from Finley Kumble on this problem.  Petitioner and Dr. Young informed the attorneys that they (petitioner and Dr. Young) had drawn approximately $90,000 on CAI's C account for reasons that included the payment of their personal creditors in the United States.  Petitioner and Dr. Young produced checks payable to their creditors in the total amount of $75,000 which had not been transmitted or cashed.[15]  Petitioner and Dr. Young later voided all of these untransmitted and uncashed checks at a subsequent meeting with Finley Kumble on October 2, 1980.

On October 10, 1980, attorneys from Finley Kumble met with petitioner and Dr. Young to discuss primarily the tax issues connected with petitioner and Dr. Young's receipt of the funds. Finley Kumble recommended that petitioner and Dr. Young ignore the existence of CAI and report the commissions as income.

---

[15] By September 1990, petitioner and Dr. Young had actually withdrawn almost $400,000 from the C account, in addition to the $75,000 of uncashed drafts, most of which was attributable to petitioner.

Petitioner and Dr. Young informed Finley Kumble that they did not want to ignore CAI's existence.

On October 27, 1980, attorneys from Finley Kumble met again with petitioner and Dr. Young. In a letter bearing the same date, Finley Kumble explained that the organization and operation of CAI departed dramatically from the basic organization and operation of a foreign corporation because: (1) CAI was organized after the business activity of locating a source of crude oil was well advanced and (2) CAI's primary business activities were carried on in the name of BarSon. Given the factual pattern of CAI's organization and operation, the letter stated, the Commissioner could argue that the assignment of income doctrine required that the income received from ABL be taxed to BarSon or, alternatively, that section 367 provided that petitioner and Dr. Young's transfer of their contractual rights to CAI was a taxable transfer. Finley Kumble advised that each theory created a substantial tax exposure to BarSon and to petitioner and Dr. Young individually.

In a letter to petitioner dated December 9, 1980, Finley Kumble reiterated its advice that the organization of CAI in midstream created dangerous ambiguities. Finley Kumble cautioned petitioner and Dr. Young that "defensive planning" had been undertaken to deal with what had already occurred, that there

were significant risks, and that it was very likely that the Commissioner would audit petitioner, Dr. Young, and/or one or more of their related entities. Finley Kumble reiterated this warning in a letter to petitioner dated December 15, 1980.

In the letter of October 27, 1980, Finley Kumble also advised petitioner and Dr. Young that Form 959, Return by an Officer, Director, or Shareholder with Respect to the Organization or Reorganization of a Foreign Corporation and Acquisition of its Stock, should be immediately filed with the Commissioner to reflect the transfer of their contractual rights to CAI. The letter explained that Form 959 must be filed by persons holding an office (or serving as a director) of a foreign corporation or owning 5 percent of its stock.

Finley Kumble prepared Forms 959 for petitioner and Dr. Young. Finley Kumble gave petitioner his Form 959 at a meeting in Bermuda, and he signed the form at that time. Petitioner never filed this (or any other) Form 959, and he did not ask Finley Kumble (and Finley Kumble did not assume the legal responsibility) to file Form 959 on his behalf.

4. CAI's Interest Accounts

In addition to the C account, CAI had time deposit (TD) accounts in which money was transferred from the C account to

earn interest. CAI also had a set-off account, an escrow account, and a collateral account.

CAI's funds at the Bank earned interest in the amounts of $15,582, $75,224, and $16,858 in 1980, 1981 and 1982, respectively. Petitioners did not report any interest income from the Bank on their 1980, 1981, or 1982 returns. Respondent determined that petitioners' gross income for the subject years included half of the interest earned in each year.

5. Petitioners' Use of BarSon and CAI Funds

In February 1979, petitioners purchased a home in Rye, New York, for approximately $160,000. In 1980, they used $18,635 of BarSon's funds to pay for work performed on that home. Petitioners sold their home in Rye, New York, in July 1994, for approximately $455,000. Respondent determined that petitioners received an $18,635 constructive dividend from BarSon in 1980, on account of their use of its funds to pay for work done to their home. Respondent determined that BarSon's accumulated earnings and profits (E&P) were $1,322,644 on March 31, 1981.

BarSon reported that it paid $20,000 in business-related legal fees to Finley Kumble in 1980 and 1981. Finley Kumble rendered legal advice to petitioners on personal matters including the registration requirements for acquiring a boat, financing the purchase of a house in New York, and preparing a

home mortgage application. Respondent determined that $10,000 of the $20,000 amount was a constructive dividend to petitioners because the legal advice pertained to petitioners' personal matters. Respondent determined that $2,500 of this dividend was paid in 1980 and the balance in 1981. Respondent also determined that petitioners used BarSon's checks in 1980 to pay for $1,000 of their personal expenses, that BarSon paid $2,728 in 1981 for petitioners' personal promotion expense, that BarSon paid $6,987 in 1981 for petitioners' personal travel, and that petitioners received a $2,295 constructive dividend from BarSon in 1981, stemming from their personal use of an automobile.

Petitioner did not personally withdraw money from CAI's accounts. Petitioner directed Mr. Quin to send money from CAI's accounts to designated payees, and Mr. Quin directed the Bank to disburse CAI's funds according to petitioner's directions. From 1980 to 1982, most of CAI's disbursements went to petitioner or to third parties designated by petitioner for his benefit.

In July 1981, CAI formed two new accounts (the A and B accounts) at the Bank, and the C account remained as CAI's operating account. Petitioner controlled the A account, and the balance therein stemmed from income for his services. Dr. Young controlled the B account, and the balance therein stemmed from income for his services. Petitioner withdrew $291,936 from the C

account for his benefit.  Petitioner and Dr. Young withdrew $247,788 from the C account for the benefit of both; respondent determined that half of this amount ($123,894) was attributable to petitioner.

Petitioner borrowed $25,000 from the Bank on December 19, 1980, and $10,000 on October 1, 1981.  Petitioner paid off the loans with funds from his account at Citibank, and with funds from the C account, the set-off account, and the A account. Petitioner caused $31,819 to be withdrawn from the set-off account and applied to his loans at the Bank.

Petitioners used checks drawn on CAI's C account to pay for more than $55,000 of renovation to their home in Rye, New York, in 1980 and 1981.  They used checks drawn from CAI's C account to pay for more than $9,000 in landscaping at that home in 1980. They used checks drawn from the C account to pay for more than $100,000 in interior decoration in 1980 and 1981.  They used checks drawn on CAI's C account to pay for summer programs for their children.  They used a check drawn on CAI's C account to pay for legal services incurred in purchasing undeveloped land in 1980 for more than $100,000.[16]  Mrs. Fields used checks drawn on CAI's C account to purchase more than $5,000 of china.

---

[16] Petitioners planned to spend an additional $217,000 to build a vacation home, two tennis courts, and a pool on the land, but they ended up selling the undeveloped land for $450,000.

Petitioners never reported any of CAI's funds used by them as income on a personal tax return. The total amount of CAI funds in the A, C, and set-off accounts used for petitioners' benefit totaled $705,107.[17] Of this amount, $245,008 was used in 1980, $312,269 was used in 1981, and $147,830 was used in 1982. Petitioner was aware that he could be charged with income from CAI and the resulting tax liability.

## 6. Reporting Requirements

Petitioners' 1980 through 1982 tax returns were prepared by their accountant, Seymour Schiller (Mr. Schiller). In connection with the preparation of those returns, petitioner did not tell Mr. Schiller that petitioners had an interest in a foreign account during the relevant years. Petitioners indicated on their 1980 and 1981 tax returns that they did not have such an interest during 1980 and 1981. Petitioners did not report on their 1982 tax return that they had an interest in a foreign account during 1982. Petitioners had an interest in CAI's bank account during each of the subject years.

## 7. Mrs. Fields

Mrs. Fields is an educated woman, and she has been involved in the business world in a limited capacity. She received a

---

[17] Respondent seeks to include only $669,124 of this income in petitioners' gross income.

bachelor's degree in education from City University of New York in 1958. She received a master's degree from City University in 1962, earning 60 credits towards a postgraduate degree. She taught grade school in New York, New York, from 1967 through 1995. She worked for Fields, Freeman & Associates (FFA) in 1981, researching, examining resumes, and making contacts for FFA. Petitioners owned 100 percent of FFA, and Mrs. Fields was its vice president and one of its officers. She was a director of BarSon, until she resigned due to illness. She managed petitioners' household finances, including paying their mortgage and balancing their checking account. She was authorized to sign petitioner's business checking accounts. She was authorized to sign checks for FFA.

Mrs. Fields knew that petitioner worked through BarSon, and that he owned 50 percent of its stock. She knew that petitioner had a business relationship with Ashland, and that this relationship concerned advising African businessmen on the topics of construction and oil. She knew that petitioner tried to secure oil for Ashland, that he had traveled to Cameroon to do so, and that he had contacted African businessmen on the procurement of oil. She knew that one of petitioner's business associates was a Government official from Cameroon, and that the relationship between him and petitioner involved oil and Ashland.

She knew that petitioner had traveled to Bermuda on business, she accompanied him on at least one occasion, and she knew that he met with Mr. Quin during that trip. She entertained petitioner's business associates at functions in their home.

Mrs. Fields signed a residential loan application stating that petitioners had a beneficial interest in Atlantis worth $300,000. Her children attended a private school in Rye, New York, in 1980 and 1981, and she knew that tuition cost about $7,000 a year for each child. Petitioners purchased a $16,735 boat in 1981.

Mrs. Fields generally did not question petitioner about their finances. She relied on him and Mr. Schiller to prepare their income tax returns correctly, and she did not question the numbers on the returns. Mrs. Fields did not ask petitioner if she could review their tax returns. She knew that petitioner would have let her review their returns if she asked.

## OPINION

Except with respect to respondent's allegations of fraud, petitioners must prove that respondent's determinations set forth in the notice of deficiency are incorrect. Rule 142(a) and (b); Welch v. Helvering, 290 U.S. 111, 115 (1933). Respondent must prove by clear and convincing evidence that petitioner is liable for the additions to tax for fraud. Sec. 7454(a); Rule 142(b).

With these basic principles in mind, we turn to the issues for decision.

Issue 1.  Commission Income

Respondent determined that most of the commissions paid by ABL to CAI were taxable to petitioners.  Respondent primarily argues that the commissions are taxable to petitioners under the assignment of income doctrine.  Petitioners argue that the doctrine prohibiting an assignment of income does not apply to the facts at hand because petitioner organized CAI upon the mandate of Ashland.  Petitioners argue that the doctrine is inapplicable because petitioner was not a shareholder of CAI. Petitioners argue that Finley Kumble organized CAI on its own initiative, and that petitioner was ignorant as to CAI's organization and operation.  Petitioners argue that petitioner insisted to Finley Kumble that all of the commissions from petitioner's services be reported by BarSon, that he informed Finley Kumble that he wanted nothing to do with an "offshore corporation", and that he fired Finley Kumble (with the exception of having the firm work on unrelated legal work for BarSon to the extent of the advanced retainer), when Finley Kumble recommended to him that he and Dr. Young evade taxes by keeping BarSon's income offshore.  Petitioner argues that Finley Kumble established and controlled CAI for Finley Kumble's personal gain.

We agree with respondent's primary argument.[18]  It is hornbook law that the person who earns income is taxed on it. United States v. Basye, 410 U.S. 441 (1973); Commissioner v. Culbertson, 337 U.S. 733, 739-740 (1949); Lucas v. Earl, 281 U.S. 111 (1930).  Thus, we must decide who "earned" the commissions paid by ABL during the years in question.  We bear in mind that "the true earner cannot always be identified simply by pointing 'to the one actually turning the spade or dribbling the ball'". Fritschle v. Commissioner, 79 T.C. 152, 155 (1982) (quoting Johnson v. Commissioner, 78 T.C. 882, 890 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984)).  We also recognize the inherent tension between the application of the assignment of income doctrine in the setting of a closely held personal service corporation (PSC) and the recognition of a PSC as a legal entity that is separate from its owners.  Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943).

We focus primarily on whether CAI or petitioner controlled the earning of the disputed commissions.  See Bagley v. Commissioner, 85 T.C. 663, 675 (1985), affd. 806 F.2d 169 (8th Cir. 1986); Johnson v. Commissioner, supra at 890-891.  In cases where the claimed earner is a closely held PSC, such as CAI, this

18 Accordingly, we do not mention or pass on respondent's alternative arguments.

Court has followed a two-prong test under which the PSC is taxed on the income when: (1) The service provider is an employee of the PSC, whom the PSC has the right to direct and control in a meaningful sense, and (2) the PSC and the service recipient have a contract or similar indicium recognizing the controlling position of the PSC. Leavell v. Commissioner, 104 T.C. 140, 151-152 (1995); Haag v. Commissioner, 88 T.C. 604, 611 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988); Bagley v. Commissioner, supra at 675-676; Johnson v. Commissioner, supra at 893; see also sec. 31.3121(d)-1(c)(2), Employment Tax Regs. When either of these prongs is not met, the individual (rather than the PSC) is taxed on the income.

We apply this test to the facts at hand. With respect to the first prong, we look to the record for indicia of an employment relationship between CAI (the PSC) and petitioner (the provider of the services that generated the commissions). We find no employment contract or other evidence of an employment relationship between the two. Indeed, petitioner acknowledged at trial that he was not CAI's employee. Given the absence of the necessary employer/employee relationship between petitioner and CAI, we are unable to conclude that CAI had the ability to direct or control petitioner's provision of the relevant services in a meaningful sense so as to satisfy the first prong of the test.

The thrust of the work concerning the earning of the commissions was performed prior to the formation of CAI, and many of the relevant contracts were executed before CAI's memorandum of association was deposited in the Bermudan Office of the Registrar of Companies. Indeed, the contract of April 21, 1980, under which ABL agreed with CAI to purchase a set amount of oil, was executed by the parties thereto after some of the oil had already been delivered on April 15, 1980. Moreover, following the organization of CAI, petitioner (and not CAI) controlled the earning of the disputed commissions. Petitioner (and not CAI) dictated the manner in which he was going to provide his services to ABL, as well as the means by which he would achieve the end contemplated by the parties to the agreement underlying the payment of the commissions.

The absence of an employment relationship between BarSon and CAI is also relevant. We are unpersuaded from the record at hand that BarSon (through petitioner and Dr. Young) rendered consulting services to ABL on behalf of CAI. We read the record to show that BarSon (through petitioner and Dr. Young) rendered consulting services only to Ashland, in accordance with the consulting agreement between those two corporations. The commissions paid to CAI served to compensate petitioner and Dr. Young for their personal services in effectuating the sale of oil

to ABL.  These services were not rendered on behalf, or under the control, of CAI.

We conclude that the first prong of the requisite two-prong test is not met.[19]  Accordingly, we hold for respondent.  With respect to petitioners' arguments for a contrary holding, we find no credible evidence in the record to persuade us that the organization of CAI was required by Ashland, or that petitioner was not a beneficial owner of CAI.  Accordingly, we reject petitioners' allegations to that effect.[20]

Issue 2.  Dividend Income

Respondent determined that petitioner received constructive dividends of $22,125 and $19,510 from BarSon during 1980 and 1981, respectively.  Respondent determined that the 1980 dividend resulted from:  (1) BarSon's payment of $2,500 to Finley Kumble for petitioners' personal legal fees, (2) $1,000 in checks drawn on BarSon's account for petitioners' primary benefit, and (3) BarSon's payment of $18,635 to contractors for work performed

---

[19] In this regard, we also find relevant that petitioner and Dr. Young performed all work necessary to find a source of oil for Ashland.  See Zand v. Commissioner, T.C. Memo. 1996-19 (under facts similar in some respects to those here, individual taxed as earner of commissions paid to corporation).

[20] We also reject petitioners' allegations that petitioner was ignorant on the formation and operation of CAI, being led astray by the unethical and self-serving conduct of Finley Kumble.  The record (including evidence of petitioner's education, intelligence, and business acumen) leads us to conclude that this argument is meritless.

on petitioners' home. Respondent determined that the 1981 dividend resulted from: (1) BarSon's payment of $7,500 to Finley Kumble for petitioners' personal legal fees, (2) BarSon's payment of $2,728 for petitioners' personal promotion expense, (3) BarSon's payment of $6,987 for petitioners' personal travel, and (4) petitioners' personal use of an automobile ($2,295). Petitioners allege that: (1) BarSon's $2,500 payment in 1980 was for professional fees rendered to BarSon, (2) the $1,000 and $18,635 amounts were charged to petitioner's loan account, and later repaid, (3) BarSon's $7,500 payment in 1981 was for professional fees rendered to BarSon, and (4) the $2,728, $6,987, and $2,295 amounts were ordinary and necessary business expenses of BarSon.

We agree with respondent that the subject amounts are includable in petitioners' gross income as dividends. A shareholder's gross income includes his or her receipt of any dividend, regardless of whether the dividend was formally declared by the corporation. Sec. 61(a)(7); Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1214 (5th Cir. 1978). Where a shareholder receives a distribution of corporate funds for his or her personal benefit, the distribution may be taxed to the shareholder as a dividend to the extent of the corporation's earnings and profits. Ireland v. United States, 621 F.2d 731,

735 (5th Cir. 1980); Loftin & Woodard, Inc. v. United States, supra at 1214; Melvin v. Commissioner, 88 T.C. 63 (1987), affd. 894 F.2d 1072 (9th Cir. 1990); see also Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929) (payment of taxes by corporation constitutes additional income to taxpayer). Key to the test of the taxability of a distribution as a dividend is whether the shareholder receives an economic benefit from the corporation without any expectation of repayment, and whether the benefit is primarily of a personal nature, unrelated to the corporation's business. Ireland v. United States, supra at 735; Loftin & Woodard, Inc. v. United States, supra at 1215-1217.

Under the facts at hand, we conclude that petitioners received an economic benefit from CAI, which they assumed no obligation to repay. Petitioners used BarSon's funds for their personal purposes, and petitioner was a 50-percent shareholder of the two-shareholder corporation. Although petitioners claim that some of these funds (the $1,000 in checks and the $18,635 used for home improvements) were lent to petitioner by BarSon for his personal use, the record does not support this naked assertion. We are unpersuaded that BarSon and petitioners intended for petitioners to pay back any of the funds that they used for their personal benefit. See Litton Business Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973). Because petitioners used

BarSon's funds to pay their personal expenses and did not intend to repay these funds, we sustain respondent's determination on this issue.[21]

Issue 3.  Interest Income

Respondent determined that petitioners received taxable interest of $7,791, $37,612, and $8,429 in 1980, 1981, and 1982, respectively, from the funds deposited at the Bank.  Petitioners allege that they did not receive any interest from the Bank because they never had an interest-bearing account there.

We agree with respondent's determination.  Gross income includes interest.  Sec. 61(a)(4).  Interest of $15,582, $75,224, and $16,858 was earned in 1980, 1981, and 1982, respectively, on the commissions deposited at the Bank.  Petitioner and Dr. Young had unfettered access to this interest, as well as to the underlying funds.  Petitioner and Dr. Young controlled the activities of the accounts.  Given the fact that petitioner was one of two beneficial owners of the bank accounts that generated the disputed interest, we sustain respondent's determination that half of the interest earned on the accounts was realized by him.

---

[21] Petitioners have also failed to persuade us that any of the distributions were business expenses of BarSon.

Issue 4.  Additions to Tax for Fraud

Respondent determined that petitioner was liable for additions to tax for fraud in each year in issue.  Petitioner disputes this determination.  Respondent must prove that petitioner underpaid his taxes in each of the subject years, and that some part of each underpayment was due to fraud, in order to sustain her allegations of fraud under:  (1) Section 6653(b), for petitioner's 1980 and 1981 taxable years,[22] and (2) section 6653(b)(1), for petitioner's 1982 taxable year.[23]  See secs.

_____

[22] As applicable to petitioner's 1980 and 1981 taxable years, sec. 6653(b) provides:  "If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment."

[23] Sec. 325(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 616-617, amended sec. 6653(b) effective for taxes the last day prescribed by law for the payment of which, without regard to extensions, was after Sept. 3, 1982.  Following its amendment, sec. 6653(b) provides in relevant part:

(1)  In general.--If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment.

(2)  Additional amount for portion attributable to fraud.--There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601--

(A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to fraud, and

(B) for the period beginning on the last day prescribed by law for payment of such underpayment
(continued...)

6211, 6653(c)(1); sec. 301.6211-1(a), Proced. & Admin. Regs.; see also Drieborg v. Commissioner, 225 F.2d 216, 219-220 (6th Cir. 1955) (where fraud is determined for each of several years, the Commissioner's burden applies separately to each of the years), affg. in part and revg. in part a Memorandum Opinion of this Court dated February 24, 1954; Estate of Stein v. Commissioner, 25 T.C. 940, 959-963 (1956) (same), affd. sub nom. Levine v. Commissioner, 250 F.2d 798 (2d Cir. 1958); DiLeo v. Commissioner, 96 T.C. 858 (1991) ("clear and convincing" standard applies to both prongs of the two-prong test), affd. 959 F.2d 16 (2d Cir. 1992); Parks v. Commissioner, 94 T.C. 654, 663-664 (1990) (same); Hebrank v. Commissioner, 81 T.C. 640 (1983) (same); Habersham-Bey v. Commissioner, 78 T.C. 304, 312 (1982) (same), and the cases cited therein.  With respect to section 6653(b)(2), the time-sensitive provision applicable to petitioner's 1982 taxable year, respondent must also prove the portion of the deficiency that is attributable to fraud.  Sec. 6653(b)(2); see Cooney v. Commissioner, T.C. Memo. 1994-50.

---

[23](...continued)
(determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, the date of the payment of the tax).

## a.  Underpayments

The mere fact that we have sustained respondent's deficiency determination does not mean that petitioner underpaid his taxes for purposes of the additions to tax for fraud.  Where, as here, we have sustained respondent's determination of a deficiency mainly by virtue of petitioners' failure to carry their burden of proof, we will not allow respondent to rely merely on that failure to sustain her burden of proving fraud.  We will not bootstrap a finding of fraud upon a taxpayer's failure to disprove the Commissioner's deficiency determination. Parks v. Commissioner, supra at 660-661.

We have carefully reviewed the record.  Following our review, we conclude that respondent has clearly and convincingly proven that petitioner underpaid his taxes for each year in issue.  See sec. 6653(c)(1) (an "underpayment" generally is the same as a "deficiency" under sec. 6211).  The record clearly convinces us that petitioner had gross income that was not reported on his 1980 through 1982 tax returns.

## b.  Fraudulent Intent

To establish fraud under section 6653(b) (for 1980 and 1981) and section 6653(b)(1) (for 1982), respondent must clearly and convincingly prove that petitioner meant to evade the payment of taxes.  Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990); Kahr v. Commissioner, 414 F.2d 621 (2d Cir. 1969), affg. in part and revg. in part 48 T.C. 929 (1967); Rowlee v. Commissioner,

80 T.C. 1111, 1123 (1983).  Whether he meant to do so is a factual question that must be resolved from the entire record. DiLeo v. Commissioner, supra at 874; Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  Affirmative evidence is required to prove an allegation of fraud because fraud is never imputed or presumed.  Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Affirmative evidence includes circumstantial factors rising from a taxpayer's course of conduct.  Spies v. United States, 317 U.S. 492, 499 (1943); Rowlee v. Commissioner, supra at 1123; Stone v. Commissioner, 56 T.C. 213, 223-224 (1971).  Circumstantial factors may show that the taxpayer meant to conceal, mislead, or otherwise prevent the collection of his or her tax.  Rowlee v. Commissioner, supra at 1123-1124; Beaver v. Commissioner, supra at 92-93.  Oft-cited circumstantial factors, generally referred to as "badges of fraud", include:  (1) Understatement of income, (2) inadequate records, (3) failure to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealing assets, (6) failure to cooperate with tax authorities, (7) engaging in illegal activities, (8) attempting to conceal activities, (9) dealings in cash, and (10) failing to make estimated tax payments.  Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; see also Meier v. Commissioner, 91 T.C. 273, 297-298 (1988).

We turn to these factors and analyze the relevant factors seriatim. We also discuss other factors that we consider to be important to our query.

### i. Understatement of Income

Petitioner substantially understated his income for 1980 and 1981 by not reporting his commissions and the interest earned thereon. Petitioner also failed to report any of the CAI or BarSon funds that he used for his personal benefit in each of the subject years. Petitioners's consistent and substantial understatement of income is strong evidence of fraud. Parks v. Commissioner, supra at 664; Marcus v. Commissioner, 70 T.C. 562, 577 (1978), affd. without publishied opinion 621 F.2d 439 (5th Cir. 1980).

### ii. Inadequate Records

Petitioner did not keep records with respect to the commissions earned by him and paid to CAI. His failure to maintain adequate records of this income is indicative of fraud. Truesdell v. Commissioner, 89 T.C. 1280, 1302 (1987); Gajewski v. Commissioner, supra at 200.

### iii. Failure to File Tax Returns

Petitioner was advised by Finley Kumble that he had to file Form 959. He failed to file Form 959, even though Finley Kumble prepared this form for him, and he signed it. We find petitioner's failure to file Form 959 under the facts contained herein to be another indicium of fraud.

iv.  Explanations of Behavior

Petitioner testified that he did not organize CAI, was not a shareholder or beneficial owner of CAI, did not have a working knowledge of CAI, and did not have authority to direct disbursements from CAI.  Petitioner testified that he was led astray by Finley Kumble as to the organization and operation of CAI.  Petitioner testified that Finley Kumble organized and operated CAI for Finley Kumble's personal gain.  Petitioner testified that he never sought legal advice on the organization or operation of a foreign corporation, and that he did not receive any related advice from, or attend any related meeting with, Finley Kumble on this subject.

The record contains substantial evidence that rebuts petitioner's testimony.  The record adequately demonstrates that petitioner sought legal assistance concerning his attempt to minimize his Federal income taxes with respect to the subject commissions; that he was actively involved in CAI's organization in an attempt to minimize his Federal income taxes; that he owned 50 percent of CAI; that he directed the payment of his personal commissions to CAI, which he knew to be nothing more than a "paper corporation"; that he instructed Mr. Quin to withdraw funds from CAI for his (petitioner's) benefit in an evasive and surreptitious manner; that the funds withdrawn from CAI were not loans to him; that he knew he had a tax problem with respect to the commissions; that he knew that the commissions were never

reported on his returns; that he ignored his attorneys' advice concerning the proper reporting of his commissions for Federal income tax purposes; and that he intended to conceal his receipt of the commissions in an attempt to evade Federal income tax. Petitioner's attempt to combat this overwhelming evidence against him with inconsistent and false explanations is further evidence of his fraud. The same is true with respect to petitioner's attempt to place the blame on Finley Kumble for his tax problems.

v. Attempt to Conceal Activities

Petitioner used nominees to conceal his ownership interest in CAI. He used a third party to withdraw substantial funds for himself and to pay his creditors as part of a scheme to avoid paying taxes on his earned commissions. We find both of these actions to be indicia of fraud.

vi. Other Factors

a. Petitioner's Sophistication

A taxpayer's sophistication and experience are relevant in determining fraudulent intent. Stephenson v. Commissioner, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984). Petitioner was a sophisticated and experienced businessman, especially in the international arena. We find this factor to be evidence of fraud under the facts contained herein.

b. Withholding Information From Tax Preparer

Petitioner's 1980 through 1982 returns contained many false statements and/or failed to report relevant information. The 1980 and 1981 returns stated erroneously that petitioner did not

have an interest in a foreign account during those years. The 1982 return did not report that petitioners had an interest in a foreign account during that year. None of the subject returns reported the commissions that petitioner earned from ABL, or the interest earned thereon. All of these misstatements (or omissions) are due to the fact that petitioner did not tell his accountant/tax preparer (Mr. Schiller) that petitioner had an interest in a foreign account. We find this factor to be evidence of fraud. Korecky v. Commissioner, 781 F.2d 1566, 1569 (11th Cir. 1986), affg. T.C. Memo. 1985-63.

### c. Legal Advice

Petitioner requested and was given legal advice on the appropriate manner to report his commissions for Federal income tax purposes. He deliberately ignored this advice. We find that petitioner's lack of regard for Finley Kumble's advice was for the primary purpose of evading taxes, and we conclude that this factor supports respondent's determination. Although not necessary to our conclusion, we note that fraudulent intent can be found by reasonable inference drawn from proof that a taxpayer deliberately closed his or her eyes to what would otherwise have been obvious to him or her. In other words, a trier of fact may infer that an individual knew of his or her evasion of tax from his or her willful blindness to the existence of that fact. Of course, the trier of fact must find that the individual actually knew of his or her tax evasion. A showing of mistake,

negligence, carelessness, recklessness, or even gross negligence will not, by itself, support such a finding.  United States v. MacKenzie, 777 F.2d 811, 818-819 (2d Cir. 1985); see also Wright v. Commissioner, T.C. Memo. 1993-328, affd. without published opinion 73 F.3d 372 (9th Cir. 1995).

### vii.  Conclusion

We find that respondent has clearly and convincingly proven fraud on the part of petitioner for all years in issue, and we so hold.  We also find that respondent has clearly and convincingly proven that petitioner is liable for the time-sensitive provision for fraud with respect to the total deficiency for 1982.[24]

### Issue 5.  Period of Limitation

Respondent generally must assess tax within 3 years of the later of the due date of a return or its filing date.  Sec. 6501(a) and (b)(1); Mecom v. Commissioner, 101 T.C. 374, 381 (1993), affd. without published opinion 40 F.3d 385 (5th Cir. 1994).  Because respondent mailed the subject notice of deficiency to petitioners after this 3-year period, she must rely on an exception to the general rule to assess Federal taxes for those years.  As one exception to the general rule, tax owed on a false or fraudulent return may be assessed at any time.  Sec. 6501(c)(1).  "Fraud" has the same meaning in section 6501(c)(1), as in section 6653(b).  Ruidoso Racing Association, Inc. v.

---

[24] We note that all of the deficiency for 1982 stems from respondent's adjustment to petitioners' interest income.

Commissioner, 476 F.2d 502, 505, 507 (10th Cir. 1973), affg. in part and revg. in part. T.C. Memo. 1971-194; Neaderland v. Commissioner, 52 T.C. 532, 541 (1969), affd. 424 F.2d 639 (2d Cir. 1970); see also Murphy v. Commissioner, T.C. Memo. 1995-76.

We have just held that the underpayments in petitioners' income taxes were due to fraud on the part of petitioner for purposes of section 6653(b). We need not repeat our analysis here. We reject petitioners' claim that the period of limitation has expired on any of the years in issue.[25]

Issue 6. Innocent Spouse

Mrs. Fields alleges that she is an innocent spouse under section 6013(e). Mrs. Fields alleges that she was unaware of petitioner's business activities, and that she had no knowledge of the subject transactions.

Spouses generally are jointly and severally liable for income taxes due on a joint Federal income tax return. Sec. 6013(d)(3); Bliss v. Commissioner, 59 F.3d 374, 377 (2d Cir. 1995), affg. T.C. Memo. 1993-390. The "innocent spouse" provision of section 6013(e) relieves a spouse of joint Federal income tax liability if the following four elements are met: (1) The spouses filed a joint Federal income tax return, (2) the return reflected a substantial understatement of tax attributable

---

[25] Based on this holding, we do not consider respondent's alternative argument that petitioners' 1980 and 1981 taxable years are open under the 6-year rule of sec. 6501(e)(1)(A).

to grossly erroneous items of one spouse, (3) in signing the return, the alleged innocent spouse did not know, and had no reason to know, of the substantial understatement, and (4) taking into account all the facts and circumstances, it would be inequitable to hold the alleged innocent spouse liable for the deficiency attributable to the understatement.  Sec. 6013(e)(1); Friedman v. Commissioner, 53 F.3d 523 (2d Cir. 1995), affg. in part and revg. in part T.C. Memo. 1993-549; Hayman v. Commissioner, 992 F.2d 1256, 1259 (2d Cir. 1993), affg. T.C. Memo. 1992-228.  The claimant of innocent spouse relief, in this case Mrs. Fields, must prove that each of these elements is satisfied.  The failure to prove any of these prongs will preclude innocent spouse relief.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Bliss v. Commissioner, supra at 378.  The innocent spouse provision was enacted to remedy "grave injustice"; however, it is "construed and applied liberally in favor of the person claiming its benefits."  Bliss v. Commissioner, supra at 378 (citations and quotation marks omitted).

The parties focus on the last two prongs of the four-prong test, and we will do likewise, starting our analysis with the third prong.  In cases involving the omission of income, such as the instant case, the fact that an alleged innocent spouse knew of the transaction that produced the omitted income ordinarily will prevent him or her from qualifying for innocent spouse

relief. Knowledge need not be actual or complete. The more an alleged innocent spouse knew about a transaction, the more likely that he or she knew or had reason to know that the return contained a substantial understatement. Id. A spouse has "reason to know" of an understatement if a reasonably prudent person, under the circumstances of the alleged innocent spouse at the time of signing the return, could be expected to know that the tax liability stated on the return was erroneous, or that further investigation was warranted. Id.; Sanders v. United States, 509 F.2d 162 (5th Cir. 1975); Bokum v. Commissioner, 94 T.C. 126, 148 (1990), affd. 992 F.2d 1132 (11th Cir. 1993); Terzian v. Commissioner, 72 T.C. 1164, 1170 (1979). Critical factors to consider in passing on this objective test include: (1) The level of education of the alleged innocent spouse, (2) his or her involvement in the family's business and financial affairs, (3) the presence of expenditures that appear lavish or unusual when compared to the family's past level of income, standard of living, and spending patterns, and (4) the "culpable" spouse's refusal to be forthright about the couple's income. Bliss v. Commissioner, supra at 378; Wimpie v. Commissioner, T.C. Memo. 1994-41.

Turning to the facts at hand, we find that Mrs. Fields knew of the underlying transactions that generated the omitted income when she signed the subject returns. The record demonstrates that Mrs. Fields knew about petitioner's business venture and

dealings with oil and the extent and magnitude thereof.  Among other things, we find that Mrs. Fields knew that petitioner worked as a consultant for Ashland, that he was attempting to secure crude oil for Ashland, that he traveled abroad extensively using his various contacts to locate a source of oil, that he traveled on business to Bermuda and Cameroon, and that his business pursuits involved Ashland, oil, and a Government official from Cameroon.

Even if we were to conclude (which we do not) that she did not know of petitioner's activities at the relevant times, we believe that she certainly should have known of the understatement of income on each of the returns when she signed them.  Mrs. Fields is well educated and intelligent.  She was actively involved in the family's business and financial affairs.  She knew of the magnitude of petitioners' spending during the relevant years, including extraordinary expenditures (e.g., purchase of a boat, purchase and renovation of homes), and she knew that the money to pay for these expenses did not come from petitioners' checking account.  A prudent person in Mrs. Fields' position would have known that the returns were erroneous or that further inquiry was warranted.  Perfect knowledge of the family's financial affairs is not required to satisfy the reason to know standard.  Shea v. Commissioner, 780 F.2d 561, 567 (6th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-310.

We also believe that the Fieldses' expenditures were lavish and unusual for a couple reporting 1980, 1981, and 1982 taxable income of $56,847, $71,010, and $5,550, respectively. Mrs. Fields failed to show that petitioner was not forthright about the omitted income.[26] Funds were always available or made available for all of petitioners' expenditures, yet Mrs. Fields never asked petitioner about the source of the large amounts of money that they spent. She also did not ask him whether the subject returns were accurate, preferring to assume that they were. If she had asked, Mrs. Fields testified, he would have given her the returns to thoroughly review. We believe that a reasonable person in Mrs. Fields' position would have inquired about the accuracy of the income reported on the returns, given the facts of this case. Mrs. Fields cannot turn a blind eye to her tax obligations and expect innocent spouse relief. See Estate of Jackson v. Commissioner, 72 T.C. 356, 361 (1979); Kenney v. Commissioner, T.C. Memo. 1995-431.

We conclude that Mrs. Fields knew (or should have known) that the subject returns contained substantial understatements. Based on this conclusion, Mrs. Fields is not entitled to innocent spouse relief regardless of whether it would be inequitable to hold her liable for the subject deficiencies. We note quickly in

---

[26] Mrs. Fields failed to establish that petitioner was evasive or otherwise misled her with respect to the true level of their income, and we find no evidence that petitioner tried to hide the unreported income from Mrs. Fields.

passing, however, that the record fails to support her assertion that it would be, in light of the factors set forth in Friedman v. Commissioner, 53 F.3d at 532. See also Meyer v. Commissioner, T.C. Memo. 1996-400; Wimpie v. Commissioner, supra. To say the least, Mrs. Fields benefited significantly from the unreported commissions in that the unreported funds allowed her to make substantial renovations and redecorations to her home, to purchase vacation property and a boat, and to send her children to an exclusive school, among other things. Petitioners also sold their home in Rye, New York, in 1994 for almost three times the amount that they paid for it in 1979, and they realized a $350,000 profit on their sale of the undeveloped land. It is also relevant to our inquiry of inequity that petitioners were still married and unseparated at the time of their trial herein; i.e., this is not a case where one taxpayer on a joint return has left the other to "face the music alone." See Hayman v. Commissioner, supra at 1263. Nor do we find any meaningful hardship that would result to Mrs. Fields by denying her innocent spouse relief.

_____

We have considered all arguments made by petitioners and, to the extent not discussed above, have found them to be irrelevant or without merit. To reflect the foregoing,

Decision will be entered

under Rule 155.